929 A.2d 501

Douglas Scott AREY

v.

STATE of Maryland.

No. 82, Sept. Term, 2006.

Court of Appeals of Maryland.

Aug. 1, 2007.

Reconsideration Denied Sept. 11, 2007.

492

John L. Kopolow, Public Defender (Nancy E. Forster, Public Defender, on brief), for appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Shannon E. Avery, Asst. Atty. Gen., on brief), for appellee.

Argued before RAKER, CATHELL,* HARRELL, GREENE, JOHN C. ELDRIDGE (Retired, specially assigned), LAWRENCE F. RODOWSKY (Retired, specially assigned), ALAN M. WILNER (Retired, specially assigned), JJ.

RAKER, J.

This case concerns a request by an inmate for DNA testing of evidence used by the State at his criminal trial in 1974. Douglas Scott Arey, appellant, was convicted by a jury in the Criminal Court of Baltimore, now known as the Circuit Court for Baltimore City, of first degree murder and use of a handgun in the commission of a crime of violence. On May 7, 2002, appellant filed a petition in the Circuit Court for Baltimore City pursuant to Md.Code (2001, 2006 Cum.Supp.) § 8–201 of the Criminal Procedure Article,[1] requesting DNA testing of blood evidence introduced at his 1974 trial. On July 18, 2006, the court denied the petition on the grounds that the

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Unless otherwise indicated, all subsequent statutory references hereinafter shall be to the Md.Code (2001, 2006 Cum.Supp.) of the Criminal Procedure Article.

requested evidence no longer exists. Appellant noted a timely appeal directly to this Court pursuant to § 8–201(j)(6).[2] We shall reverse and remand.

## I.

In May 1973, appellant was indicted by the Grand Jury for Baltimore City on charges of first degree murder and other related crimes. He proceeded to trial before a jury in April 1974, and was convicted of first degree murder and use of a handgun in the commission of a crime of violence. The court imposed a sentence of life imprisonment for first degree murder, and a concurrent sentence of ten years for the handgun violation. On June 2, 1975, the Court of Special Appeals, in an unreported opinion, affirmed the judgments of conviction.

We glean the following facts underlying appellant's conviction from the record of appellant's trial and the unreported opinion of the Court of Special Appeals. Appellant was employed by Samuel Shapiro, and was fired by him around April 27, 1973 because of appellant's violent temper. Shapiro's secretary, Nancy Frank, testified at trial that she overheard an argument between appellant and Shapiro about when appellant could pick up his final paycheck. Shapiro told appellant that he could pick up the paycheck a week after his termination, and after appellant returned a specific set of keys. Soon thereafter, a woman attempted to retrieve the paycheck from Frank for appellant, but Frank refused to give it to her because appellant had yet to return the keys. Frank testified that when she returned to work the following Monday morning, the check had been stolen from her desk. Frank testified that after appellant was fired, she found a note stuffed under the door which stated, "I'll get you, you dirty Jew bastard."

---

2. Md.Code (2001, 2006 Cum.Supp.) § 8–201(j)(6) of the Criminal Procedure Article provides that "[a]n appeal to the court of appeals may be taken from an order entered under subsection (c), (h)(2), or (j)(4) of this section."

At trial, the State called as a witness Dennis Moon, who testified, under a grant of immunity, that he had assisted appellant in murdering Shapiro. Specifically, Moon testified that on May 9, 1973, he lured Shapiro to the Belvedere Hotel, where appellant shot and killed Shapiro. Appellant and Moon placed Shapiro's body in a trunk, which they then placed in appellant's car. Appellant drove to Pennsylvania and threw the trunk into a ravine.

The police telephoned appellant about a week later, when Shapiro's body was found, and asked him to come in for questioning concerning the death of his former boss. Appellant complied and admitted to the police that he shot Shapiro. After charging appellant, the police seized a shirt and a pair of pants that appellant was then wearing in order to test blood stains on each. The blood was tested and the lab results revealed that the clothing contained type AB blood. The police also took samples of Shapiro's and appellant's blood. Appellant had type O blood; Shapiro had type AB.

Appellant filed several pretrial motions, including a motion to suppress the results of the blood tests. At a pretrial hearing, he argued that during the police interrogation before the police seized his clothing, he became nervous and started to pick the pimples on his face. By doing this, he caused small amounts of blood to pool on the open sores. Detective James Russell of the Baltimore City Police Department witnessed the actions of appellant and testified that he observed him wipe the blood from his face onto his shirt. Appellant contended that bacteria from the pustules that emanated from his pimples, which mixed with his blood, may have skewed the results of the blood tests performed on the clothing. Appellant claimed that his bacteria likely contained antigens similar to those tested for in type A and B blood, and that when his bacteria mixed with his blood—through picking his pimples—the mixture produced a result of AB, rather than O.

During a pretrial hearing, appellant asked the court to allow him to replicate the process of putting blood and bacteria from his pimples on the same shirt to show that the original lab

results were potentially flawed. The court granted appellant's request, but the re-testing of appellant's blood and bacteria mixture resulted in a finding of group O blood. Appellant, still unsatisfied by the results of the blood tests, requested custody of the shirt to conduct an independent analysis on the original blood stains. The State claimed, however, that there was insufficient blood remaining to run a proper test, and appellant never obtained custody of the clothing.

At trial, the State introduced, *inter alia*, the results from the blood tests, the testimony of Frank and Moon, and appellant's confession to establish that appellant was involved in Shapiro's murder. As indicated, the jury convicted appellant.

On May 7, 2002, appellant, acting *pro se* from prison, filed a petition in the Circuit Court for Baltimore City pursuant to § 8–201 for DNA testing of the blood that was present on the clothing seized from him during the police interrogation.[3]

---

**3.** Section 8–201 provides, in pertinent part, as follows:

"(a) *Definitions*—
(1) In this section the following words have the meanings indicated.
(2) 'Biological evidence' includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained.

\* \* \*

(5) 'Scientific identification evidence' means evidence that:
(i) is related to an investigation or prosecution that resulted in a judgment of conviction;
(ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and
(iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.
(b) *Filing of petition.*—Notwithstanding any other law governing postconviction relief, a person who is convicted of a violation of § 2–201, § 2–204, § 2–207, or §§ 3–303 through 3–306 of the Criminal Law Article may file a petition for DNA testing of scientific identification evidence that the State possesses as provided in subsection (i) of this section and that is related to the judgment of conviction.
(c) *Findings Requiring DNA testing.*—Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:

Appellant requested that "the clothing marked as 'evidence' be immediately retrieved from the Criminal Court Evidence Lockers, Hall of Records or wherever it may be secured, and provided to defense counsel for independent laboratory analysis...." In support of his petition, appellant recounted the testimony of Detective Russell and proffered that DNA testing of the blood on the clothing would show that his blood only is present. Appellant asserted that the laboratory technician who had performed the blood tests was unqualified and gave false testimony about the blood test results. Appellant represented that DNA testing will prove that the laboratory technician lied, and will thereby exonerate him.

It is unclear whether appellant was acting *pro se* in this case, or whether he was represented by a public defender.[4] Although his initial pleadings were filed *pro se,* the Circuit Court sent a letter to appellant and the State, dated August 8, 2005, stating that an assistant public defender, Suzanne Drouet, reported to the court that she was told the requested evidence was destroyed many years ago and appellant had 30 days from the date of the letter to provide information to the court indicating otherwise. In response to the court's letter, appellant filed a pleading, entitled "Response to Bald Allegations; Affidavit of Facts and Exhibits; Motion for Appointment of Counsel and Request for Witness Summons to Appear and Produce Evidence at a Motions Hearing." He maintained that "[i]t would be egregious to grant the State's Motion [to dismiss] because Drouet ... has no authority to make claims for the State of Maryland. Her bald allegation is not sup-

---

(1) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing

\* \* \*

(d) *Notification of petition; response.*—

(1) A petitioner shall notify the State in writing of the filing of a petition under this section.

The State may file a response to the petition within 15 days after notice of the filing or within the time that the court orders."

**4.** Before this Court, appellant was represented by the Office of the Public Defender.

ported by any facts...." He prayed that the court order the State to "enter affidavits and evidence that the DNA evidence, and clothing and related trial materials, be certified as having been searched for and the results of such said search outside of second-hand hearsay," and to "[h]old an evidentiary hearing for appointment of counsel should the Office of the Public Defender decline to continue to represent [appellant]...."

The court scheduled a hearing for July 25, 2006, noting that "[s]hould the State produce prior to the hearing an affidavit from someone with firsthand knowledge stating that the State no longer has the evidence for which the [appellant] has requested the testing, there will be no need for the hearing and it will be cancelled." Subsequently, the State filed an affidavit of police Sergeant David K. Ferber. The affidavit stated as follows:

"1. I have been employed with the Baltimore Police Department since October 17, 1979. I currently serve as the Sergeant-in-charge of the Evidence Control Unit ("ECU"). ECU is charged with the storage of evidence and property seized by the Baltimore Police Department.

2. I have searched the ECU database for the clothes requested by Mr. Arey but cannot locate the same. In addition, I have searched the forms kept on file in ECU to determine the location of the clothes. However, I did not find any forms that reference the clothes.

3. Because I cannot locate the clothes requested by Mr. Arey through ECU's database or the forms kept on file, and in light of my experience at ECU, I have concluded that the requested evidence no longer exists."

On July 17, 2006, in light of Sergeant Ferber's affidavit, the court cancelled the hearing and filed the following Order:

"Upon consideration of Petitioner's Motion for DNA Analysis, all supplemental memoranda filed by Petitioner in support thereof, and the Affidavit of Sergeant David K. Ferber, Sergeant-in-charge of the Evidence Control Unit, it is this 17th day of July 2006,

ORDERED that the Petitioner's Motion for DNA Analysis is hereby DENIED for the reason that Sergeant David K. Ferber represented in his affidavit that 'the [ ] evidence [requested by Petitioner to be tested] no longer exists' and Mr. Arey has failed to produce any evidence to the contrary."

Appellant filed two subsequent motions entitled "Motion to Strike Defective Affidavit of Sergeant Ferber" and "Motion to Strike the Premature Court Order of July 17, 2006." Appellant asserted that the court ruled "on a serious case through acceptance of patently false submissions." In the latter motion, he claimed that "it is egregious for the court to act on any purported affidavit submitted by the respondent State prior to permitting the [appellant] appropriate time ... to rebut or provide further evidence contrary to that allegedly supplied by the State." In each motion, appellant requested a hearing in the Circuit Court to enable him to respond to the Ferber affidavit. The court denied both motions. Pursuant to § 8–201(j)(6), appellant noted a timely appeal directly to this Court.

## II.

Before this Court, appellant argues that the trial court erred in denying his petition for DNA testing because the State failed to show that the evidence he requested for testing no longer exists. He maintains that the Circuit Court erred by placing the burden on him to show that the evidence exists. Appellant also asserts that due process of law entitled him to an evidentiary hearing on his petition for DNA testing. Finally, he argues that he was entitled to the assistance of counsel under Article 24 of the Maryland Declaration of Rights,[5] or, at

---

5. Maryland Declaration of Rights, Art. 24, provides as follows:
 "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

a minimum, a discretionary ruling by the court on his request for counsel.

The State responds that the trial court denied appellant's petition properly by relying on Sergeant Ferber's affidavit. As to any right to an evidentiary hearing, the State argues that the plain language of § 8–201 does not entitle appellant to an evidentiary hearing on the issue as to whether the DNA evidence still exists. Finally, the State maintains that appellant was not entitled to appointed counsel.

### III.

We address first appellant's argument that the State failed to show that the evidence in question no longer exists. Appellant argues that merely checking the ECU database or ECU forms kept on file is neither extensive nor intensive enough to support a reasonable conclusion that the clothes do not exist. Appellant points out that in his affidavit and motion of August 11, 2006, he suggested another location where the clothing could be located, that being the trial judge's chambers. As a basis for this suggestion, appellant quotes the trial transcript, which reflects that appellant's clothing was kept locked there during the trial,[6] and the case of Kirk Bloodsworth, where Bloodsworth was exonerated by DNA evidence found in the judge's chambers.

This Court had occasion to interpret § 8–201 in *Blake v. State*, 395 Md. 213, 909 A.2d 1020 (2006). Pursuant to § 8–

---

6. At appellant's trial, Detective Russell of the Baltimore City Police Department testified as follows:

"Q: What happened to those clothes, Detective Russell, after you saw them on Mr. Arcy?
A: He was charged, and they were taken away from him and submitted to the *Crime Lab*. To the *property room* first.
 * * *
Q: All right. Did you physically bring those clothes from the Crime Lab the early part of last week to the Courtroom?
A: Yes, I did.
Q: All right. Have they been in your custody from that time until today?
A: They have been locked up in the *Judge's chambers*."

201, Blake sought an evidentiary hearing and DNA testing of scientific evidence used by the State at his 1982 trial for first degree rape and first degree sexual assault. The Circuit Court summarily dismissed the petition before Blake had an opportunity to respond to the State's motion to dismiss, which represented that the evidence had been destroyed. This Court held that the Circuit Court should not have summarily dismissed the petition for testing before Blake had an opportunity to respond to the State's motion to dismiss. *Id.* at 222, 909 A.2d at 1025. We concluded that the court should not have dismissed the petition based merely on the motion before it. *Id.* at 227, 909 A.2d at 1028. In addition, we pointed out that because the evidence had been in the custody of the State, the State had the burden of establishing that it no longer existed. *Id.* An unsworn memorandum, stating that the police checked only the evidence control unit and nothing was found, was insufficient to establish that the evidence no longer existed. *Id.* at 231, 909 A.2d at 1031.

As guidance, we carefully considered a cogent report published by the National Commission of the Future of DNA Evidence—a commission created in 1998 by the National Institute of Justice ("NIJ")—entitled "Postconviction DNA Testing: Recommendations for Handling Requests" ("NIJ Report"). *Available at* http://www.ncjrs.org/pdffiles1/nij/177626.pdf. We noted that the NIJ Report "urges prosecutors to search for evidence in nontraditional sources" and "cautions prosecutors against concluding too hastily that evidence that an inmate has asked to be tested no longer exists." *Blake,* 395 Md. at 233, 909 A.2d at 1031. We noted that the NIJ Report recommended that a search for evidence should include certain "most likely places," including, *inter alia,* the following: [7]

"Prosecutor's office. Evidence is often found here when it has been introduced at trial.

State and local crime laboratories will often retain slides or other pieces of evidence after conducting testing. Labora-

---

7. Not all of these sites may be relevant, in a given case.

tories will usually return to the police department the clothing and vaginal swabs that are introduced as exhibits at trial.

Hospitals, clinics, or doctors' offices where sexual assault kits are prepared.

Defense investigators.

Courthouse property/evidence rooms.

Offices of defense counsel in jurisdictions that require parties to preserve exhibits produced at trial.

Independent crime laboratories.

Clerks of court.

Court reporters."

*Blake*, 395 Md. at 221–22, 909 A.2d at 1025 (quoting NIJ Report at 46). In addition, it is reasonable to assume that police departments, sheriff departments, clerk offices of the court, and like departments had protocols in place for the destruction of evidence, even before the enactment of § 8–201. The State should identify the protocol that was in place from the time of the trial to the time of the request for testing, if possible, and see if that protocol was followed.

We agree with appellant that the Circuit Court erred in dismissing his petition for testing based on Sergeant Ferber's representation that, because he checked the ECU's database and forms on file, it was reasonable to conclude that the evidence no longer exists.[8] Searching the ECU alone was insufficient. *See Blake*, 395 Md. at 232–33, 909 A.2d at 1031 (stating that "[s]imply asking a police officer to check an evidence unit locker is not sufficient"). The evidence in this case had been tested by a laboratory; slides possibly had been made. We have no idea as to the protocol the police or the custodian of evidence utilized at the time the evidence purportedly was destroyed. Because the State was the custodian of the evidence, the State needs to check any place the

---

8. We note that when appellant's petition came before the Circuit Court, the court did not have the benefit of our recent opinion in *Blake v. State*, 395 Md. 213, 909 A.2d 1020 (2006).

evidence could reasonably be found, unless there is a written record that the evidence had been destroyed in accordance with then existing protocol. "[N]o final decision or notification should be made until it has been carefully verified that evidence did not or does not still exist." *Id.* at 233, 909 A.2d at 1031–32 (quoting NIJ Report at 36). In other words, a court should not conclude that evidence no longer exists until the State performs a reasonable search for the requested evidence.

In this case, the State should have attempted to determine the proper protocol for handling and destroying evidence in Baltimore City in 1974. From this, the State might have discovered other locations to search for the requested evidence or determined more conclusively its fate. At a minimum, a reasonable search in the instant case would have required the State to look in the crime lab referred to in Detective Russell's testimony, if the lab is still in existence, for any slides used to test the blood evidence used against appellant or for pieces of the clothing he requested; the property room, if it was different from the ECU; and because the testimony at trial was that the evidence had been stored in the Judge's chambers, as unlikely as it is that it would be there after all these years, an inquiry as to that location.

## IV.

We address next appellant's argument that the trial court erred by placing the burden on him to produce evidence as to the continuing existence of the DNA evidence. We reiterate that which we said in *Blake:*

"[T]he burden is on the State to establish that it is no longer in possession of the DNA testing evidence requested by a petitioner when it seeks to have the court dismiss a DNA testing petition on such grounds. It is only logical that this burden is upon the State, as the State gathered the evidence and was the custodian of the evidence. The information as to the location of the evidence and the manner of its

destruction would not be within the knowledge of an inmate."

*Blake,* 395 Md. at 232, 909 A.2d at 1031. Once the State performs a reasonable search and demonstrates sufficiently a *prima facie* case, either directly or circumstantially, that the requested evidence no longer exists, the State will have satisfied its burden of persuasion. The burden of production then shifts to the petitioner to demonstrate that the evidence actually exists. Because the trial court erred in dismissing appellant's petition based on the representation in the Ferber affidavit, we do not reach appellant's argument that the court shifted the burden of persuasion improperly.

## V.

██ Appellant makes the broad claim that due process entitles him to an evidentiary hearing. In *Blake,* we examined § 8–201 in light of Blake's contention that before the Circuit Court dismissed his petition for DNA testing on grounds that the evidence no longer existed, he was entitled to respond to the State's representation that the evidence no longer exists. We concluded as follows:

> "[T]he Circuit Court erred in dismissing the petition without, at a minimum, giving appellant an opportunity to respond to the State's allegation that the DNA testing evidence was no longer in its possession. Fundamental fairness requires that a petitioner be given an opportunity to respond and to challenge the State's representation. When it is the State's position that the evidence sought to be tested no longer exists, the circuit court may not summarily dismiss the petition requesting DNA testing. The court must give a petitioner notice of and an opportunity to respond to the State's allegation. A petitioner has a right to notice and opportunity to contest the State's representation that the evidence is unavailable."

*Blake,* 395 Md. at 228, 909 A.2d at 1028–29. We did not, however, address the question of whether, and if so, under what circumstances, a person requesting DNA testing of

evidence under § 8–201 is entitled to an evidentiary hearing. *Id.* at 229, n. 12, 909 A.2d at 1029, n. 12.

Many statutes of our sister states require courts to hold hearings when petitions for DNA testing are filed.[9] Other statutes leave the decision to hold hearings on DNA testing petitions to the discretion of the courts.[10] It appears to us that these statutes merely codify the inherent power of a court to hold a hearing.

As we noted in *Blake*, § 8–201 does not expressly require a hearing on a petition for DNA testing, and this Court has not adopted rules that would require a hearing.[11] *Id.* at 224–25, 909 A.2d at 1026–27. In a footnote, we discussed due process and the right to a hearing, noting as follows:

"Writing for the Court in *Phillips v. Venker,* 316 Md. 212, 557 A.2d 1338 (1989), Judge John F. McAuliffe discussed

---

**9.** *See, e.g.,* Ark.Code Ann. § 16–112–205(a) (2006) ("Unless the petition and files and records of the proceeding conclusively show that the petitioner is entitled to no relief, the court shall promptly set an early hearing on the petition . . ."); Ga.Code Ann. § 5–5–41(c)(6)(A) (Supp. 2006) ("If, after the state files its response, if any, and the court determines that the motion complies with the requirements of . . . this subsection, the court shall order a hearing to occur after the state has filed its response . . ."); Nev.Rev.Stat. § 176.0918(5) (2003) ("The court shall hold a hearing on a petition filed pursuant to this section"); R.I. Gen. Laws § 10–9.1–12(a)–(b) (Supp.2006) ("After notice to the prosecution and a hearing a justice of the superior court shall order testing after [making certain findings]"); Va.Code Ann. § 19.2–327.1(C) (2004 & Supp.2007) ("The court shall, no sooner than 30 and no later than 90 days after such motion is filed, hear the motion").

**10.** *See, e.g.,* Cal.Penal Code § 1405(e) (West 2000 & Supp.2007) ("The court, in its discretion, may order a hearing on the motion"); Ind.Code Ann. § 35–38–7–7 (West 2006) ("The court may, in its discretion, order a hearing on the petition"); N.J. Stat. Ann. § 2A:84A–32a(b) (West 1994 & Supp.2007) ("The court, in its discretion, may order a hearing on the motion").

**11.** We suggest that this Court's Standing Committee on Practice and Procedure review § 8–201 and consider drafting rules trial courts should follow in considering petitions for DNA testing. It is clear that the issue will arise again in the future, and the statute, as enacted by the General Assembly, does not contemplate the myriad issues that may arise.

due process concerns and the types of hearings which may be required. He noted as follows:

'In some instances, even a temporary deprivation of a property interest followed by a right to a full hearing has been held to violate due process unless a pretermination hearing is provided. In other circumstances, a 'paper hearing,' i.e. the right to be 'heard' through the filing of documents and written arguments, may suffice. As the Supreme Court has said, '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Rather, it is 'flexible and calls for such procedural protections as the particular situation demands.'

*Id.* at 218, 557 A.2d at 1341 (internal citations omitted)."

*Blake*, 395 Md. at 229, n. 12, 909 A.2d at 1029 n. 12.

We do not believe that Article 24 of the Maryland Declaration of Rights requires an evidentiary hearing when the petition is filed. Nonetheless, given the purpose underlying the statute, which is to provide a means for incarcerated persons to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing, and notwithstanding that § 8–201 is silent on the issue of hearings, if the court determines that there is a *genuine* factual dispute as to whether the evidence exists, ordinarily the court should hold a hearing.

## VI.

Appellant's final argument is that he was entitled to the assistance of counsel under Article 24 of the Maryland Declaration of Rights or, at a minimum, to a discretionary ruling on his request for counsel. There is no right to appointed counsel under § 8–201, either statutory or constitutional, to assist a person in filing a petition under the statute or during the initial stages of the proceedings. *Blake*, 395 Md. at 234–38, 909 A.2d at 1032. By contrast, the rights of a petitioner change if the DNA testing results are favorable to the petitioner. Section 8–201(h)(2) provides as follows:

"If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:

(i) if no postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, open a postconviction proceeding under § 7–102 of this article; or

(ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, reopen a postconviction proceeding under § 7–104 of this article."

Section 7–108 of the Uniform Postconviction Procedure Act provides that a person is entitled to assistance of counsel and a hearing on a petition filed under § 7–102. Section 7–108(b) provides further that the court "shall determine whether assistance from counsel or a hearing should be granted" on a petition filed under § 7–104. It is clear that under § 8–201, a petitioner has no absolute statutory right to assistance from counsel unless and until the petitioner receives favorable DNA testing results, and has not opened a postconviction hearing previously. If a petitioner has opened a postconviction hearing previously, the court may, in its discretion, appoint counsel.

 We conclude that although there is no constitutional or statutory right to counsel at the time a petitioner files the petition for DNA testing, a court has the inherent power to appoint counsel at any stage of proceedings under § 8–201. *See Wynn v. State*, 388 Md. 423, 433, 879 A.2d 1097, 1103 (2005) ("The concept of inherent authority . . . is grounded in the understanding that courts must possess certain powers in order to function as courts"). *See also State ex rel. Fitas v. Milwaukee County*, 65 Wis.2d 130, 221 N.W.2d 902, 904–05 (1974) ("It is within the inherent power of the courts to appoint counsel for indigents"); *Wise v. State*, 708 N.W.2d 66, 69–70 (Iowa 2006) (noting that courts are not required to, but may, at their own discretion, appoint counsel in postconviction cases). The inherent powers of the court are not derived from legislative grant or specific constitutional provisions, but from

the very fact that the court has been created and charged by the Maryland Constitution with certain duties and responsibilities. *See Wynn,* 388 Md. at 432, 879 A.2d at 1102–03 (stating that "in addition to the specific powers and functions expressly granted to the three organs of the government by the Constitution, each branch possesses additional powers perforce implied from the right and obligation to perform its constitutional duties" (quoting *Attorney General v. Waldron,* 289 Md. 683, 690–91, 426 A.2d 929, 933–34 (1981))); *Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 401, 435 A.2d 747, 753 (1981) (stating that the test for inherent powers is whether such a power "is necessary to the performance of the judicial function as contemplated in our state constitution" (quoting *Clerk of Court's Comp. for L.C. v. L.C. Com'rs,* 308 Minn. 172, 241 N.W.2d 781, 786 (Minn.1976)))). The inherent powers of the court are those powers which are necessary to exercise its jurisdiction, administer justice, and preserve its independence and integrity. *See United States v. Hudson,* 11 U.S. (7 Cranch.) 32, 34, 3 L.Ed. 259 (1812) ("Certain implied powers must necessarily result to our Courts of justice from the nature of their institution"). Accordingly, the Circuit Court has the inherent power to appoint counsel to represent a petitioner when the court believes counsel would be necessary to further the interest of justice.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*