15 A.3d 787

**George E. BLAKE**

v.

**STATE of Maryland.**

**No. 58, Sept. Term, 2010.**

Court of Appeals of Maryland.

March 22, 2011.

Kerry Brainard Verdi (Howrey, LLP, Washington, DC; Gregory Kaufman of Sutherland Asbill & Brennan, LLP, Washington, DC), on brief, for Appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

MURPHY, J.

George E. Blake, Appellant, is before this Court for the second time. At 1:15 p.m. on January 7, 1982, a jury convicted Appellant of first degree rape and first degree sexual offense. The State's evidence was sufficient to establish that he committed those offenses on July 27, 1981. He filed his petition for DNA testing on December 1, 2004.

As a result of his first petition, this Court (1) held that the Circuit Court for Baltimore City erred in "summarily" dismissing Appellant's *pro se* petition for DNA testing, and (2) established "the procedures a circuit court must follow before it denies a petition for postconviction DNA testing pursuant to § 8–201 [of the Criminal Procedure Article (CP § 8–201)] on grounds that the evidence the petitioner has asked to be tested no longer exists." *Blake v. State,* 395 Md. 213, 216, 909 A.2d 1020, 1021 (2006) (*"Blake I "*). While reversing the dismissal of Appellant's petition, this Court stated:

First, the court should not have summarily dismissed the petition for testing before Blake had an opportunity to respond to the State's motion to dismiss. Second, the court should not have dismissed the petition based merely on the memorandum before it stating that the evidence no longer existed. Inasmuch as the statute requires that the State preserve scientific evidence, Blake was entitled to know, if such could be determined, if the evidence was destroyed before or after the enactment of the statute. Third, because the evidence has been in the custody of the State, the State has the burden of establishing that it no longer exists. An unsworn memorandum, stating that the State merely requested the police to look in the evidence control unit, is insufficient to establish this critical fact. Finally, the court should make some findings of fact and should set forth the underlying reasons when it dismisses a petition for testing.

We conclude that the Circuit Court erred in dismissing the petition without, at a minimum, giving appellant an

opportunity to respond to the State's allegation that the DNA testing evidence was no longer in its possession. Fundamental fairness requires that a petitioner be given an opportunity to respond and to challenge the State's representation. When it is the State's position that the evidence sought to be tested no longer exists, the circuit court may not summarily dismiss the petition requesting DNA testing. The court must give a petitioner notice of and an opportunity to respond to the State's allegation. A petitioner has a right to notice and opportunity to contest the State's representation that the evidence is unavailable.

395 Md. at 227–28, 909 A.2d at 1028–29 (footnotes omitted).

Because a remand for further proceedings was required as a result of the State's insufficient response to Appellant's petition, this Court provided the following guidance to the parties and to the Circuit Court:

A broad approach to the future of DNA evidence and recommendations for handling postconviction DNA testing requests were addressed in a report by the National Commission on the Future of DNA Evidence, a commission created in 1998 by the National Institute of Justice ("NIJ") at the request of Attorney General Janet Reno.

\* \* \*

The report from the Commission, entitled POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, National Institute of Justice, National Commission on the Future of DNA Evidence, September 1999, http://www.ncjrs.org/pdffiles1/nij/177626.pdf ("1999 NIJ Report"), set out proposed guidelines for analyzing cases in which DNA evidence is presented.

\* \* \*

The report recommends that the searcher for evidence should check the most likely places where the evidence may be found, and suggests the following locations:

"Police department evidence or property rooms. Evidence is often found here if the evidence was never tested

or it was sent to the State crime laboratory, which then
returned it.

Prosecutor's office. Evidence is often found here when it
has been introduced at trial.

State and local crime laboratories will often retain slides
or other pieces of evidence after conducting testing. Lab-
oratories will usually return to the police department the
clothing and vaginal swabs that are introduced as exhibits
at trial.

Hospitals, clinics, or doctors' offices where sexual assault
kits are prepared.

Defense investigators.

Courthouse property/evidence rooms.

Offices of defense counsel in jurisdictions that require
parties to preserve exhibits produced at trial.

Independent crime laboratories.

Clerks of court.

Court reporters."

*Id.* at 46.

395 Md. at 219–222, 909 A.2d at 1023–25 (footnote omitted).

In *Arey v. State,* 400 Md. 491, 929 A.2d 501 (2007), while
reversing another "summary dismissal" of a *pro se* petition for
DNA testing (on the ground that the State's response was
insufficient to establish that the evidence no longer existed),
this Court stated:

[T]he State needs to check any place the evidence could
reasonably be found unless there is a written record that
the evidence had been destroyed in accordance with then
existing protocol.... [A] court should not conclude that
evidence no longer exists until the State performs a reason-
able search for the requested evidence.

\* \* \*

Once the State performs a reasonable search and demon-
strates sufficiently a *prima facie* case, either directly or
circumstantially, that the requested evidence no longer ex-
ists, the State will have satisfied its burden of persuasion.

The burden of production then shifts to the petitioner to demonstrate that the evidence actually exists.

*Id.* at 503–05, 929 A.2d at 508–09.

In a Rules Order entered on September 10, 2009, this Court adopted Title 4, Chapter 700 of the Maryland Rules of Procedure, which took effect on October 1, 2009, and which "insofar as practicable, [are applicable] to all [petitions for DNA testing] then pending[.]" Although our remand in *Blake I* preceded the adoption of Title 4, Chapter 700, the Circuit Court crafted a procedure that conformed to the requirements of that chapter. The record shows that the Circuit Court (1) identified the most likely places where the evidence might be found, (2) required a thorough search of each place that should be searched, and (3) provided for an "on-the-record" determination of whether the search conformed to the requirements of CP § 8–201. To resolve the issue of whether the State satisfied its ultimate burden of persuasion, the Circuit Court held four hearings,[1] during which it received testimony, documentary evidence, affidavits, and proffered information about the State's efforts to locate the evidence sought to be tested.[2] The Circuit Court ultimately concluded that the State had met its burden of proving that the evidence no longer exists, and "ORDERED that [Appellant's] Petition [for DNA testing be] DENIED." Appellant has noted a timely appeal from that ruling.

In support of its argument that this Court should affirm the judgment of the Circuit Court, the State asserts (in the words of its brief):

Of the ten suggested places to search listed by this Court in *Blake I* and *Arey,* four are not applicable (defense investigators, courthouse evidence rooms, offices of defense counsel,

---

1. The hearings were held on November 21, 2008, February 20, 2009, June 12, 2009, and April 7, 2010.

2. Resolving the merits of a petition for DNA testing is somewhat analogous to resolving, at a scheduling conference governed by Md. Rule 2–504.1, issues relating to the discovery and/or production of electronically stored information.

and independent laboratories) and the other six are well accounted for. The police evidence storage facilities were hand-searched by teams of people looking for any evidence from Blake's case, and the relevant police evidence protocols produced. Every member of the State's Attorney's office was directed repeatedly to look for anything that could be related to Blake's case, and the files of the Sex Assault division were individually searched. The computer records and paper records of the crime lab were searched, and its storage facility hand-searched. The hospital where the "rape kit" examination was conducted was searched and its protocols presented to the court. The courtroom clerk and the court reporter's office confirmed that they did not have, and would never take possession of, physical evidence in Blake's case or any other case.

\* \* \*

The fact that the court, on repeated occasions, compelled the State to go [ask] and search a little more indicates that the court was quite cognizant of its duty to carefully decide this matter. Its ultimate decision—that the State's combined, cumulative efforts were "reasonable"—was well-founded and should not be disturbed.

According to Appellant, however, the search of two "most likely places where the evidence [at issue] may be found" was inadequate. In the words of his brief:

1. The Search of the Evidence Control Unit (ECU)/OffSite Storage Facility Conducted by the State to Locate DNA Evidence from [Appellant's] 1982 Rape Trial was Unreasonable Based on the Guidance Provided by this Court and the Good–Faith, Reasonableness Standard Adopted by the Circuit Court for Baltimore City.

2. The Search of the State's Attorney's Office was Unreasonable Based on this Court's Previous Guidance and the Good–Faith, Reasonableness Standard.

For the reasons that follow, we hold that there is no merit in either of these arguments, and we shall therefore affirm the

judgment denying Appellant's request that the State be required to conduct additional searches for the evidence at issue.

## Background

During the jury trial that resulted in Appellant's convictions, the State introduced into evidence the Baltimore City Police Department's "LABORATORY REPORT" that identified twelve "specimens" recovered from the victim and examined in the laboratory. According to this report, after the examination, this "[e]vidence was placed in the Evidence Control Section under property numbers 858944 and 858947." Returning the examined specimens to Evidence Control was consistent with the Department's "General Order 4–79" on the subject of the investigation of rape and related sexual offenses. A stated purpose of this General Order was "to promulgate a new 'Physical Examination and Collection of Evidence for Rape and Sexual Assault' form, which was developed in cooperation with and approved by the Office of the Baltimore City State's Attorney and the appropriate staff representatives of the participating hospitals, and representatives of the Maryland Department of Mental Health and Hygiene." The *REQUIRED ACTION* section of General Order 4–79 includes the following requirements with respect to evidence:

*Evidence*

> All evidence which is recovered as a result of the medical examination shall be turned over to the investigating officer and shall be submitted to the Evidence Control Section for Scientific examination by the Laboratory Division. All other evidence, whether recovered at the scene, from the victim or from the assailant, shall also be collected and submitted promptly to Evidence Control Section. Material evidence which may contain semen, blood, or other organic derivatives shall be designated for analysis by the Laboratory Division.

During the February 20, 2009 hearing, which was a "joint" hearing held on both Appellant's petition and a similar petition

filed by Douglas Scott Arey,[3] the State presented testimony from Lieutenant Colonel Michael Andrew (Andrew), the commanding officer of the Baltimore City Police Department's Evidence Control Unit, and Sergeant Larry Bazzle, the officer assigned to that unit who supervised the search for evidence in the Blake and *Arey* cases. The following transpired during Andrew's direct examination:

Q [H]ave you recently conducted an inventory and a search of the facilities at the Police Department?

\* \* \*

A We finally got funding from the City to get an outside company, Regis, to come in, do a definitive inventory of all of the evidence we have in the Evidence Control Unit. They conducted this process from February 3 through February 6 of this year. And we just got the results of their definitive inventory.

\* \* \*

Q And was there also a problem with the flood from Isabel?

\* \* \*

A In our Evidence Control Unit at the time, in 2003, we were located in the basement of the Headquarters Building located at 601 East Fayette Street. Unfortunately, we had a hurricane [come] through that flooded the area and flooded the basement of the Police Department. We had a number of evidence, I can't definitively say which evidence items, but we had a number of items that were destroyed with that hurricane. . . .

\* \* \*

Q And when you say "a number", can you give us a ballpark estimate? Are we talking about a few, are we

---

3. *See Arey v. State*, 400 Md. 491, 929 A.2d 501 (2007), in which this Court applied the holding of *Blake I* to the Circuit Court's denial of Mr. Arey's petition for DNA testing of blood evidence introduced during the 1984 trial that resulted in his conviction for the offense of first degree murder.

talking about dozens, hundreds, thousands of pieces of evidence, can you say?

A I would say thousands. We hired a company, at the time the Baltimore Police Department hired a company from Texas to come in and dry out the evidence and relocate it to an off-site warehouse. There were some items we just couldn't identify that the water ruined. Thousands, I do know for a fact, that thousands of items were relocated and dried out and relocated to the warehouse I mentioned.

\* \* \*

Q And with regard to the case of, the Blake case, were you also asked to look for certain pieces of evidence in that case?

A Yes ma'am.

Q ECU 858947, a microscopic slide, four vaginal slides, three oral slides, four swabs, head and pubic hair, pubic combings, multi-colored panties, multi-colored sheets, fitted and flat, and a multi-colored pillow case. And also ECU 858944, a blood sample?

A Yes ma'am.

Q And were any of those found pursuant to the search?

A No evidence was found under that property number.

\* \* \*

Q And is there any other searching that could be done or have you exhausted all possible avenues of searching?

A With this definitive inventory that we just conducted, we've conducted all possible inventories. We've conducted many hand searches thinking that it might have been placed on a different shelf, it might have been relocated to a different place over the course of the past two years. That's why we got the money from the City to conduct the definitive inventory that I just mentioned. They couldn't find it. They had over 80 auditors for the four days that I mentioned, plus I had 25 officers and other employees of the Police Department

that helped them. And we searched for all evidence related to these cases and we couldn't find anything.

The following transpired during Sgt. Bazzle's direct examination:

Q What specifically did you do with regard to those two cases.

A With the cases, when I was first advised of the Blake case and gave the two property numbers, the first thing I did was go to the drawers where the old 56 forms are kept.

Q And what are 56 forms?

A The 56 form is when the property first comes into Evidence Control. The officer will sign the 56 form, sign such information such as the complaint number, the crime, the date it happened, what they're submitting, the victim's name, the suspect's name and address, as well as the officer's name and his district. And with the 56 form, the person of ECU personnel will stamp this property number on the 56 form.

Q And with regard to the Blake case, were you able to find any 56 forms?

A No I could not.

\* \* \*

Q So then what did you do?

A At which time then I looked in the old green card file. And the green card file as when property was put away back in those eras, they would put the property number on the green card and then put the location where the property was kept. Now since then, the old green card, I just happened to look, I know since they moved everything up to the off site location, the green card wouldn't have the off site location on them because they were all the old cards. But I looked at them anyway, just in case perhaps they might have wrote down the new location.

Q And they were organized by ECU number?

A Property number.

Q And you had property numbers for the evidence in the Blake case, did you not?

A Yes I did.

* * *

Q So what else, if anything did you do?

A At which time on the Blake case, when they got the off site facility, the warehouse in 2003, and I was aware of that. When they moved all of the old property up to the off site facility, they conducted a micro Excel spreadsheet where they put the numbers in the computer and put what shelf number they go on. Throughout working through ECU, sometimes when I put an old property number in, it would give me the correct location. There's other times when I put a property number in and no location came up.

Q But with method [sic] what, if anything, were you able to find with regard to the Blake case?

A I put both the property numbers 858947 and 858944 in there and it had no results found.

* * *

Q What, if anything else, did you do?

A At that time in November, myself along with another member of the Evidence Control Unit, and I had about 30 pre-hire police officers, we all went up to the off site facility where the old property is kept. I showed the pre-hires old property with what to look for, the tag which would be on there, or just an old property number written on the item.

Q Excuse me. Not to be too detailed, but pre-hires would be people who have passed all of the clearances necessary, but haven't yet been hired?

A Right. They passed everything given by the Police Department and they were just waiting for when an academy class starts up.

Q So they would be hired as police officers?

A Police officer trainees.

Q So these pre-hire, trainee pre-hires we'll call them, what did you have them do?

A I showed them what old property looked like, I gave them these two numbers. I broke them off into groups and I had them search every single shelf where the old property was kept looking for these numbers.

Q And with regard to the Arey case, the shirt, did you do anything about that?

A No, I didn't have a property number.

Q And what else did you do? Did they find anything?

A They didn't find anything.

Q With regard to the evidence the Lieutenant Colonel described as contaminated or mangled evidence from the storm, can you describe what they looked like?

A Well, there were bags, when they hired the company to dry everything else, (inaudible) bag they came up in all of the water—the property that was damaged in the water, they would put in plastic bags. And from moving the plastic bags around or having these bags sit in the water in the plastic bag, because the water would come out of the bio bag or whatever bag, and seep into this plastic bags. And the bags sitting in the plastic bags, the tags, the property identification numbers, would wear off the bags. So when they took them up to the warehouse, every time I would come across one of these contaminated bags we put them in groups. We sat down with rubber gloves and face masks on, we would slit these bags open and try to piece together the property numbers that were torn apart in the flood.

Q And [was] this part of what Regis did or was this the separate search?

A This was our separate search.

Q And did Regis do anything with this contaminated property as well?

A Well, they couldn't because there wasn't any property numbers on this property.

Q Were you able to find the evidence from the Blake case

A No I could not.

On September 3, 2009, the Circuit Court signed the following *ORDER:*

Upon consideration of Petitioner George Blake's (Post-conviction no. 8819) Motion to Contest the Reasonableness of State's Search for DNA Evidence it is this *3rd* day of September, 2009, hereby

**ORDERED** the motion is **GRANTED IN PART** such that within forty-five (45) days the State is ordered to provide to Petitioner and this Court

1. Evidence of the ECU and off-storage facility evidence destruction policies from the time of Mr. Blake's trial through the present;

2. Identify the evidence retention policy at the State's Attorney's Office from the time of Mr. Blake's trial through the present;

3. Determine what protocol was in place at the time of Mr. Blake's trial through the present for the retention of evidence in the Clerk's office;

4. Identify the protocols in place for the Court reporter's Office for the destruction of evidence from the time of his trial through the present;

5. Identify the protocols for evidence retention and/or destruction in place of Mercy Hospital from the time of the Blake trial trough the present;

It is further

**ORDERED** the Motion is **DENIED** in all other respects.

The final hearing on Appellant's motion was held on April 7, 2010. During that hearing, Appellant's counsel stated:

In light of [the prosecutor's] proffer that we will be receiving this information, additional information, from Mercy Hospital, we don't have any further requests of the State

at this time. With the exception of a search of ECU and their offices.

On April 21, 2010, the Circuit Court filed a *MEMORAN-DUM* that included the following provisions:

Following the final hearing on this matter held April 7, 2010; the State submitted (1) the affidavit of Dr. Charles I. Shubin, MD, at Mercy Hospital; and (2) an affidavit respecting ECU logbook entries for the Petitioner.

The State has also indicated that it will submit the following:

1. An affidavit regarding the search of the Mercy Hospital Archives;

2. An affidavit from a nurse or other hospital employee who worked in Mercy Hospital's Emergency Room in the early 1980s;

3. The affidavit of Sergeant Bazzle regarding microslides presently kept in the ECU from the time of this case and earlier, and;

4. Evidence that an email was sent to Baltimore City State's Attorney employees requesting they search their offices for micro-slides.

Upon submission of the documents referenced above, this Court will be satisfied that the State has done a reasonable search under § 8–201 of Maryland's Criminal Procedure Article, and at such time as these items are finally submitted, it is the intent of the Court to deny Mr. Blake's Petition for DNA Testing of Scientific Evidence.

The following *ORDER* was entered on May 17, 2010:

Upon consideration of [Appellant's] Petition for DNA Testing of Scientific Evidence, the Affidavit of Dr. Charles Shubin, M.D., the Affidavit concerning BCU logbook, the Affidavit of Debra Holbrook, the Affidavit of Sgt. Larry Bazzle and the Court Memorandum filed April 7, 2010, it is this *17th* day of May, 2010, by the Circuit Court for Baltimore City, Part 30, hereby

ORDERED that the Petition is DENIED.

## Discussion

### I.

 The "clearly erroneous" standard of review is applicable to the Circuit Court's finding that the search of the ECU was "a reasonable search under § 8–201 of Maryland's Criminal Procedure Article."

It is reasonable to conclude that the evidence sought to be tested was handled in conformity with the routine practice of the Circuit Court and the Police Department. In addition to General Order 4–79, the record includes an affidavit signed by the Manager of the Circuit Court's Courtroom Clerk's Division that contains the following assertions:

2. This department is responsible for storing exhibits at the conclusion of trials. The only exhibits that we store pending the appeal process are paper exhibits (photos, photo arrays, medical records, etc.) We also keep audio tapes, video tapes and any kind of posters used.

3. All exhibits that have been entered into evidence that came from the police department's Evidence Control unit must be returned to the officer that brought the evidence to court or the State's Attorney in the officer[']s absence to be returned to Evidence Control.

4. All Physical evidence must be returned (Clothes, Biohazards, liquids, jewelry, weapons and the ballistics, drugs, etc.)

5. The evidence in question: **ECU# 858947** (micro slide, vaginal slides, oral slides, four swabs head and [pubic] hair, pubic combings, multicolored panties, multicolored sheets, and a multicolored pillow case)

**ECU# 858944**–Blood samples is all considered physical evidence with a police department number. All of these exhibits would have been returned to the officer or the state's attorney to be returned to Evidence Control.

The procedure attached to the Manager's affidavit includes the following statements:

*Evidence Retained in Criminal Cases*

When evidence is retained by the clerk through the luncheon recess or at the end of the court session for the day, the following procedures must be followed:

\*　　\*　　\*

5.　At the end of the trial, the officer will be responsible for retrieving all physical evidence to be returned to E.C.U. The retention slip is stamped with the following: **"Officer is responsible for retrieving police property entered into evidence at the conclusion of the trial."** This alerts the officer that the exhibits must be retrieved.

\*　　\*　　\*

8.　If the officer is still in court at the conclusion of the trial, release the property to the officer. All papers or documents that are police property must be returned to the Editor with the file.

\*　　\*　　\*

10.　If the officer is not in the courtroom at the conclusion of the trial, return all police property to State's Attorney. He/she will then be responsible for notifying the officer to pick up the evidence.

(Emphasis in original).

■ The record includes a tape recorded statement by the lawyer who, as an Assistant State's Attorney for Baltimore City, was the prosecutor at Appellant's trial. According to this person,[4] Assistant State's Attorneys did not take custody of exhibits at the conclusion of a criminal trial. The record also includes a letter from the Chief of the Circuit Court's Reporting Services, stating that the Court Reporters do not take custody of physical evidence. In light of the fact that the jury returned its verdict at 1:15 p.m., it is unreasonable to

---

**4.** It is of no consequence that the recorded statement was not made under oath. Members of the Maryland Bar are officers of the court who have an obligation to comply with the Rules of Professional Conduct (MRPC). MRPC 3.3 prohibits a Maryland lawyer from making a false statement in a judicial proceeding.

conclude that the evidence at issue ended up anywhere other than in the Evidence Control Unit.

Appellant argues that (in the words of his brief), "[Because] [i]t is impossible to know if the swabs or slides or other ['unmarked'] DNA evidence is marked in some way that could connect it to Mr. Blake, despite the lack of an evidence control number[,] the search conducted of the ECU is not reasonable and the State should be ordered to direct someone with knowledge of the evidence at issue in this case to search the unmarked evidence to determine if any of the DNA evidence can be located." In light of the above quoted testimony of Sgt. Bazzle, however, we reject that argument, and hold that the Circuit Court was not erroneous—"clearly," or otherwise—in finding that the search of ECU was "a reasonable search under [CP] § 8–201[.]"

## II.

■ There is no merit whatsoever in the argument that the search of the State's Attorney's Office was unreasonable. As stated above, the record includes a tape recorded statement by the former Assistant State's Attorney for Baltimore City who was the prosecutor at Appellant's trial, confirming that Assistant State's Attorneys did not take custody of exhibits at the conclusion of criminal trials. While we commend the Circuit Court's decision to follow the above quoted NIJ recommendations, when—as in the case at bar—it has been established that the prosecutor's office does not take custody of exhibits that form part of the trial record, the denial of a request for a search of the prosecutor's office would not be unreasonable.

Appellant argues that the search of the State's Attorney's Office was nothing more than (in the words of his brief), "a cursory 'walk-through[.]' " The Circuit Court disagreed with that argument. From our review of the record, which includes a video recording of the search of the Office's Sex Offense Unit, so do we.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

