37 A.3d 932 (2012)
424 Md. 632
Michael D. WASHINGTON
v.
STATE of Maryland.
No. 22, Sept. Term, 2011.
Court of Appeals of Maryland.
February 21, 2012.
*933 Marc A. DeSimone, Jr., Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.
Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.
Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.
GREENE, J.
On January 24, 1990, Appellant Michael D. Washington[1] was convicted by a jury in the Circuit Court for Wicomico County of first degree rape and related offenses. On February 23, 1990, Appellant was sentenced to life in prison. He subsequently noted an unsuccessful appeal to the Court of Special Appeals, after which this Court denied his petition for writ of certiorari. Washington v. State, 323 Md. 186, 592 A.2d 179 (1991). Appellant then filed several unsuccessful post-conviction petitions. On May 29, 2009, Appellant filed in the Circuit Court for Wicomico County a Petition for Search for DNA Material and Petition for DNA Testing, pursuant to the DNA EvidencePostconviction Review Act, Md.Code (2001, 2008 Repl.Vol.), § 8-201 of the Criminal Procedure Article. On August 28, 2009, the Circuit Court granted Appellant's Petition for Search for DNA Material, and the court's Order was served on various law enforcement agencies that may have had possession of or access to biological evidence related to Appellant's case. Several affidavits and letters were sent to the court in response to its Order to search for the requested evidence. On August 3, 2010, Appellant filed a Petition for Production and Testing of DNA Material, a Motion for a New Trial, and a *934 Petition for Writ of Actual Innocence.[2] A hearing on the various requests for relief was held on January 20, 2010, and the presiding judge issued a written opinion on March 7, 2011, denying the relief requested by Appellant.
On March 21, 2011, pursuant to Md. Code (2001, 2008 Repl.Vol.), § 8-201(k)(6) of the Criminal Procedure Article, Appellant noted a direct appeal to this Court. Appellant presents the following issues for our review:
(1) Did the lower court err in finding that the conceded destruction of biological evidence relating to Mr. Washington-Bey's conviction by the Wicomico County Sheriff's Office was not intentional and willful, and in refusing to afford Mr. Washington-Bey relief due to this intentional and willful destruction of evidence?
(2) Did the lower court err in finding that Mr. Washington-Bey's conviction does not rest upon unreliable scientific identification evidence, and denying Mr. Washington-Bey's Motion for a New Trial on that basis, given that the evidence at trial showed that semen found in connection with a rape was produced by another man, the archaic forensic science used at trial could not eliminate Mr. Washington-Bey as a contributor to that sample, the State's theory of the case posited that this evidence showed Mr. Washington-Bey's guilt, and present-day technology would disclose the number of contributors to the semen sample, the genetic identities of all contributors, and Mr. Washington-Bey's definitive innocence?
(3) Did the lower court err in finding that the State had performed a reasonable search for the requested biological identification evidence when the State refused to provide the Wicomico County Sheriff's Office's evidence retention and destruction policies pre-dating 2007, despite being ordered by the court to do so, and a deputy sheriff testified that those policies were not only in the office's present possession, but sitting on another deputy's desk?
We shall hold that the determination made by the hearing judge, based upon all of the evidence presented, that the State performed a reasonable search and that the requested scientific identification evidence[3] no longer exists was not clearly erroneous. We shall also hold that the State's duty to preserve scientific identification evidence, pursuant to § 8-201 (j),[4] begins as of the date the statute *935 was enacted and is not to be applied retroactively. Because the hearing judge's determination that the scientific identification evidence in this case was destroyed prior to the enactment date of the statute, was not clearly erroneous, we hold that subsection (j) of the statute is not applicable to the circumstances of this case and Appellant is not entitled to the relief provided therein. Lastly, we hold that the hearing judge's denial of Appellant's Motion for a New Trial, filed pursuant to § 8-201(c),[5] was not an abuse of discretion, as Appellant did not establish that the serological testing and results offered by the State at trial were unreliable and that there was a substantial possibility that Appellant would not have been convicted without the serological evidence.

FACTUAL AND PROCEDURAL BACKGROUND
At Appellant's jury trial in the Circuit Court for Wicomico County, Estelle Mae Coleman testified that on August 18, 1989, she left her home in Salisbury, Maryland, at approximately 12:30 a.m. to meet an acquaintance. She claimed that while she was walking along a road near her home, she encountered a man, whom she identified at trial and in a pre-trial photo array as Appellant, and she asked if she could have a cigarette. Ms. Coleman stated that Appellant then attacked her, dragging her to the side of the road. She testified that Appellant raped her and that he ejaculated during the rape. Ms. Coleman stated that Appellant told her his name was "Mike," and she observed that he had been "carrying a tote bag" that he left at the scene when he fled. Ms. Coleman testified that she gave the clothes she was wearing at the time of the attack to the police and that she later went to the hospital,[6] where a rape kit was collected.
Deputy Ron Boles of the Wicomico County Sheriff's Department testified that he responded to the scene of the attack in the early morning hours of August 18, 1989. After the assailant fled, Deputy Boles conducted an area search of the scene, during which he discovered a bag that contained papers addressed to Michael Washington. Appellant later testified that he had a traveling bag with him on the evening of August 17, 1989, and into the early morning hours the following day. Appellant testified that he left this bag in some bushes behind a local Elks Club, and when he went to retrieve it at approximately 2:00 a.m., he discovered it had been stolen.
Officer Wanda Bonang of the Wicomico County Sheriff's Department testified that she took custody of Ms. Coleman's clothing at approximately 12:00 p.m., on August 18, 1989. Officer Bonang testified that she took the clothes "to [the] Sheriff's Department and secured them in a property locker, and they were later transported up to the crime lab." Officer Bonang also indicated that Detective Robin Roberts of the Wicomico County Sheriff's Department transported Ms. Coleman to the hospital, where a "Maryland State Police Sexual Assault Evidence Collection Kit" was used to gather biological evidence. Detective Roberts testified that she was presented *936 with Ms. Coleman's rape kit by hospital personnel. Officer Bonang took custody of the rape kit from Detective Roberts, and indicated that she "placed it in [the Sheriff's Department] refrigeration unit, [the] security refrigerator, and advised [the] property custodian that [she] had blood and hair samples and other samples from a rape that needed to be taken to Pikesville and examined[.]" Detective Roberts testified that she and a nurse took samples from Appellant at the Wicomico County Detention Center following his arrest, including "pubic hairs, head hairs, blood, [and] saliva."
Sharon Dubey, a serologist with the Maryland State Police Crime Laboratory, testified as an expert in the field of serology regarding the analysis she performed on the biological evidence obtained in connection with the case. In defining the term "secretor," Ms. Dubey stated, "If a person is a secretor they secret[e] into their other body fluids other than their blood [meaning semen or saliva].... Therefore, you can type what a person's blood type will be from another body fluid[] if they [a]re a secretor." Ms. Dubey testified that twenty percent of the population are non-secretors. From her analysis of Appellant's blood and saliva samples, Ms. Dubey concluded that her results were consistent with Appellant being a non-secretor with blood type O. From her analysis of Ms. Coleman's blood in a known sample, Ms. Dubey determined that Ms. Coleman was a secretor with blood type O.
Ms. Dubey testified that her examination of the vaginal swabs from the rape kit indicated that there was semen present but that there was no antigenic activity detected. This finding led her to conclude that the sample was "either consistent with a person who is a non-secretor having contributed it or consistent with not enough sample to even detect [any blood group antigens.]" Ms. Dubey testified that there was "a possibility" that a nonsecretor contributed to the semen found on the vaginal swabs in the rape kit.
Ms. Dubey examined Ms. Coleman's underwear "[f]or the presence of blood or semen or any other body fluids." Her examination led her to conclude that there was a stain on the underwear containing semen and spermatozoa. When she analyzed the stain, Ms. Dubey detected the "[p]resence of A and H blood antigens," which is consistent with a secretor having contributed to the stain. Ms. Dubey testified that there were four possibilities that could explain the results she obtained from her testing of the stain: (1) group A secretor(s) contributed; (2) group A secretor(s) and group O secretor(s) contributed; (3) group A secretor(s) and non-secretor(s) of any blood group contributed; or (4) group A secretor(s), group O secretor(s), and non-secretor(s) of any blood group contributed. Ms. Dubey maintained that, in accordance with this list of possible explanations, her findings did not eliminate Appellant as a suspect. Because Ms. Dubey's analysis indicated that Appellant and Ms. Coleman both had blood type O, she testified that it was impossible that the fluids on the underwear came from either Ms. Coleman or Appellant. Ms. Coleman was recalled to the witness stand and testified that she had consensual intercourse with a man whose name she did not know earlier in the evening, prior to the rape; Ms. Coleman testified that she was wearing the same clothing from that time until the time of the rape.
The State, in the rebuttal portion of its closing argument, referenced Ms. Dubey's testimony regarding Appellant's non-secretor status and the results of her analysis:
The expert point blank told you that in her examination she could not eliminate the defendant, that what she found *937 does not eliminate the defendant. Unfortunately, I had to call Miss Coleman to explain the presence of someone else's semen in the underwear. We have discussed that, difficult to do, and she [h]as indicated she has had a rough time. That was the purpose of calling her in, back in I should say.
The expert based on her examination of [the] vaginal swabs doesn't eliminate him; in fact, includes him in this small group of 20 percent of the population. Vaginal swabs, if you recall examined indicated that the person could be a non-secretor in which the defendant was one. So it is not excluded. He is in fact linked in the vaginal swabs.
The jury convicted Appellant of first degree rape, second degree rape, third degree sexual offense, fourth degree sexual offense, assault, and battery. Thereafter, the court imposed a life sentence.
In his Opinion and Order, the Circuit Court judge presiding over the post-trial matters that are the subject of this appeal summarized the procedural history of this case following Appellant's sentencing:
[Appellant] filed several post-conviction motions, including a Motion for a New Trial, a Motion for Reduction or Modification of Sentence, [and] a Motion to Correct an Illegal Sentence. Each of these motion[s] was denied. [Appellant] also appealed and on March 27, 1991, the Court of Special Appeals affirmed the judgment. [Appellant] filed a Petition for Writ of Certiorari, which was denied by the Court of Appeals on July [18], 1991. On December 6, 1991, [Appellant] filed a Petition for Post-Conviction Relief. A hearing was held on July 24, 1992 and post-conviction relief was denied. [Appellant] subsequently filed an Application for Leave to Appeal, which the Court of Special Appeals denied. On August 22, 2003, [Appellant] then filed three subsequent Motions to Re-Open Post Conviction Case. The first two motions were denied. The third motion to Re-Open Post Conviction was granted; however, relief was denied. [Appellant] filed an Application for Leave to Appeal, which the Court of Special Appeals granted. On June 11, 2008, the Court of Special Appeals affirmed the judgment of this court. [Appellant] filed a Petition for Writ of Certiorari, which was denied on September [12], 2008.
* * *
[O]n May 29, 2009, Defendant filed a Petition for Search for DNA Material and Petition for DNA Testing. This matter was called for a hearing on July 31, 2009. At the hearing, the State was represented by Deputy State's Attorney Sampson G. Vincent. [Appellant] was represented by Marc A. DeSimone of the Office of the Public Defender. On August 28, 2009, this [c]ourt granted [Appellant's] Petition for Search for DNA Material. The Order was then served on the various parties who may have had access to any DNA material relating to [Appellant's] case. Various affidavits were returned in response to th[is] court's [O]rder.
The Order issued by the Circuit Court directed "the Wicomico County Sheriff's Office, the Maryland State Police, the Maryland State Police Crime Laboratory, Peninsula Regional Medical Center (successor to Peninsula General Hospital Medical Center), and the State's Attorney for Wicomico County" to comply with its mandates, which included "search[ing] for any and all biological evidence relating to the investigation, trial, and conviction" of Appellant. The named recipients were to report their search efforts and results to the court within sixty days after being served with the Order.
*938 In response to the court's Order, on October 27, 2009, Sampson G. Vincent, the Deputy State's Attorney for Wicomico County, filed an affidavit with the court stating that he was the prosecutor at Appellant's trial. Mr. Vincent asserted that at the time of the trial, all physical exhibits entered into evidence were retained by the court following trial and were then returned to the Sheriff's Office, specifically to Howard Perdue, on June 12, 1991. Mr. Vincent stated that all physical material not offered into evidence would have been retained by the investigating deputies. Mr. Vincent claimed that before the State's Attorney's Office was relocated in 1998, the Office had no room or locker for evidence retention, so all evidence would have been returned to the investigators.
Mr. Vincent maintained that when he moved to the new Office location he did not have any material related to Appellant's case in his personal possession. Furthermore, Mr. Vincent claimed that he personally conducted a search of each shelf and box in the State's Attorney's evidence room, assisted by Lee Butler, and was unable to find any evidence, evidence logs, or documentation related to Appellant's case. Lastly, Mr. Vincent asserted that "[t]he State's Attorney's Office has always advocated that physical evidence in all ... cases ... with a life sentence[] be maintained by the police agency even after appeals are exhausted as post conviction petitions are often filed years later." Moreover, Mr. Vincent claimed that he "never would have authorized the destruction of evidence in a rape case in which a defendant received a life sentence."
A letter dated November 18, 2009, from Detective Sergeant Gary A. Bromwell, Assistant Barrack Commander of the Maryland State Police Department, was filed with the court in response to its Order to search for evidence related to Appellant's case. In the letter, Sergeant Bromwell indicated that "after careful review of our files, we were unable to locate any of the requested evidence from a 1989 rape case. The Maryland State Police did not investigate this case."
Lieutenant Mark David Babe Wilson filed a notarized letter with the court on December 14, 2009, stating that he was the current Division Commander of the Property and Evidence Unit for the Wicomico County Sheriff's Office. Lieutenant Wilson asserted that on November 4, 2009, he personally searched each shelf and box of the Wicomico County Sheriff's Office property and evidence room, assisted by Corporal Brian Donahoe, and was unable to find any evidence relating to Appellant's case. Lieutenant Wilson stated that "[t]he last documentation of evidence in a chain of custody log date[d] back to June 12, 1991," and the entry indicated that Wendy Restein, a clerk of the Wicomico County Circuit Court, returned the evidence to Howard O. Perdue, the Property Custodian at the time.[7] Lieutenant Wilson maintained that neither he nor any personnel currently assigned to the Property and Evidence Unit had "any direct or indirect knowledge about the handling and maintaining of evidence regarding the Washington case in 1989 to June 12, [1]991." Attached to Lieutenant Wilson's letter was a memorandum written in 2002 by James J. Nealon, the Property Custodian for the Wicomico County Sheriff's Office, asserting that the Maryland State Police Crime Laboratory and all of the evidence vaults within the Sheriff's Office were searched and did not produce any evidence relating to Appellant's case. Mr. Nealon further maintained that "[i]t is unknown where and when the evidence was destroyed."
Teresa M. Long, Director of the Maryland State Police Forensic Sciences Division, *939 submitted an affidavit to the court on December 16, 2009, indicating that staff members "searched any and all places in which biological evidence relating to the investigation [of Appellant's case] might have been found[.]" Ms. Long stated that current logbooks and logbooks for the long-term storage facility were searched, and there were no relevant entries. Ms. Long asserted that staff members searched files kept in the unit for cold case analysis, and they did not find any files related to Appellant's case. In addition, according to Ms. Long, staff members searched the current inventory list, which contained no reference to Appellant's case. Ms. Long maintained that in the original chain of custody for the file, there was a communication dated April 16, 2002, stating that the Sheriff's Office disposed of the evidence. The chain of custody also indicated that the DNA reference samples from the victim and the suspect were returned to Crime Scene Technician, M. Webster on October 17, 2001. Ms. Long concluded that, pursuant to her search, the Division did not possess any evidence related to Appellant's case nor did it have any record of having destroyed any evidence related to the case.
An affidavit from Roberta Mandelson, Director of Laboratory Services for Peninsula Regional Medical Center, was filed with the court on December 23, 2009. Ms. Mandelson asserted that she personally conducted a search of the Medical Center and "found no hematology and histology samples taken from Estelle Mae Coleman on August 18, 1989, and tested and placed in Ms. Coleman's Permanent File at Peninsula Regional Medical Center[.]" Moreover, Ms. Mandelson indicated that the evidence drawer from 1989 no longer exists. Ms. Mandelson stated that she found no underwear, vaginal swabs, or laboratory slides related to Appellant's case. Ms. Mandelson claimed that she searched the slide storage areas in the Cytology Department, in her office, and in the old section of the Medical Center, and she was unable to find any slides related to Appellant's case. Lastly, Ms. Mandelson explained that regulations required the hospital to keep cytology slides for ten years, and after that period, slides were microwaved and removed by an outside company.
On August 3, 2010, Appellant filed a Petition for Production and Testing of DNA Material and a Motion for a New Trial. On January 20, 2011, a hearing on the Motions was held in the Circuit Court for Wicomico County. During the hearing, the presiding judge took judicial notice of the affidavits submitted by Sampson Vincent and Teresa Long, as well as the letter submitted by Sergeant Gary Bromwell.
At the hearing, the State called Roberta Mandelson, and the court took judicial notice of her affidavit. When asked whether there were any hospital policies dealing with collection of sexual assault DNA evidence, Ms. Mandelson responded, "Yes. Two are laboratory procedures dealing with the specimens, and one is ... from the hospital manual for the Emergency Department in collection of evidence." With regard to when these policies were put in place, Ms. Mandelson stated, "The hospital policy for the Emergency Department was effective September 1st of 2007. The original procedure in the laboratory was written December of 1996 andactually, both laboratory procedures were December 1996." Ms. Mandelson stated that she did not have any knowledge of prior policies used by the hospital. On cross-examination, Ms. Mandelson stated that old cytology slides are destroyed by an outside company twice per year, and there is no record kept of which slides are destroyed.
After the court took judicial notice of Lieutenant Mark David Babe Wilson's affidavit, *940 Lieutenant Wilson was cross-examined regarding his knowledge of the Wicomico County Sheriff's Office evidence retention policies. When questioned about the Office's current purging policies, in effect since October 2007, Lieutenant Wilson stated, "Whatever we may have in our system is sent back to the officer for review, and he contacts the State's Attorney to see if there is any outstanding litigation that is in effect to include civil, traffic and criminal as well as appeals." Lieutenant Wilson testified that he was only aware of Sheriff's Office policies regarding evidence retention and destruction in existence from October 2007 to the time of the hearing. Lieutenant Wilson asserted, however, that older versions of Sheriff's Office evidence retention policies are retained and that "[t]hey would be with the Administrative Captain." Lieutenant Wilson testified that, although the policy of the Office since 2007 has been to keep documentation of evidence that is purged, he could not speak to the policies in place prior to that time. With regard to Appellant's case, Lieutenant Wilson stated that "we have nothing showing a destruction of it.... We just show it coming back in `91 to our debit."
The State next called Corporal Brian Donahoe, the Wicomico County Sheriff's Office Property and Evidence Section Supervisor. Corporal Donahoe testified that he performed a hands-on search of all of the shelves, and the areas behind the shelves, in the evidence vaults, and he was unable to locate any evidence related to Appellant's case. Corporal Donahoe stated that his knowledge of evidence retention and destruction policies dated back to when he came to the Office in August 2008, and he was not familiar with any policies prior to that time. In describing the current policy, Corporal Donahoe stated:
I do annual purges of all the property that's on the shelves, and I go through the property. I write down the case number, what the description of the property is, and who the investigating deputy is, and I submit to them what is called a disposal form. It's a disposition status of their property from their case. And I submit that to them.[[8]]
They have ten days to respond back to that with what disposition they want done with their property, to be held for continuing court purposes or destroyed or returned to owner, returned to MVA for tags, that type of thing.
* * *
It is the deputy's responsibility to contact the State's Attorney's Office and say, our case, because they worked on the case together through trial, I have evidence disposal for this, what would you like done with this evidence?
Thus, according to the retention policies in place at the time of the hearing, as explained by Corporal Donahoe, the process involved a collaborative effort between the investigating officer and the State's Attorney's Office. If the officer and the State's Attorney's Office determined that the evidence should not be destroyed, the paperwork was "marked HOLD really big on it," to indicate that the evidence should continue to be retained.
Corporal Donahoe stated that when he reviewed the paper file for Appellant's case, the evidence had come into the Sheriff's Office in 1991 to a previous property custodian, and in 2001 "Mr. Nealon had researched looking for it. He had written up an affidavit or something, said he couldn't find it, that it wasn't there[.]" Corporal Donahoe maintained that the paper *941 file did not indicate that the evidence had been purged.
Wendy Restein testified that in 1990, she was a courtroom clerk in the Circuit Court for Wicomico County. Ms. Restein reviewed the property log from Appellant's case, and testified that the log indicated that she accepted evidence for the case on January 24, 1990, and later released the evidence to Howard Perdue, with the Sheriff's Office, on June 12, 1991. With regard to the court's retention of certain evidence, Ms. Restein stated, "The Clerk's Office is required to keep evidence either until the appeal time is up or if it's appealed, until the mandate is received from the Court of Special Appeals."
Following the hearing, on March 7, 2011, the hearing judge issued a written Opinion and Order denying the relief requested by Appellant. In analyzing this Court's case law construing § 8-201 of the Criminal Procedure Article, the hearing judge referenced our opinion in Blake v. State, in which we stated that "when an inmate files a petition for postconviction DNA testing, the State should make an extensive search for the evidence." Blake v. State, 395 Md. 213, 232, 909 A.2d 1020, 1031 (2006) [hereinafter Blake I] (citation omitted). The judge noted this Court's holding in Arey v. State, 400 Md. 491, 503, 929 A.2d 501, 508 (2007) [hereinafter Arey I], that "[t]he State should identify the protocol [of the relevant law enforcement agency] that was in place from the time of the trial to the time of the request for testing, if possible, and see if that protocol was followed." The hearing judge stated that, consistent with this Court's opinion in Arey I, the burden was on the State to demonstrate "a prima facie case, either directly or circumstantially, that the requested evidence no longer exists." Arey I, 400 Md. at 505, 929 A.2d at 509. Lastly, according to the hearing judge, Arey I supports the proposition that only after the State has performed a "reasonable search" should the court conclude that the scientific identification evidence no longer exists. Id.
The hearing judge ultimately concluded that the State had met its burden under Arey I. The judge determined that "[a] reasonable search was undertaken which included the Wicomico County State's Attorney's Office and Sheriff's Office, the Maryland State Police Crime Laboratory, PRMC and the clerk's office of the Circuit Court." The judge asserted that, pursuant to the holding in Arey I, the burden shifts to the defendant to establish that the requested evidence still exists. The judge concluded that Appellant had not met this burden, and, accordingly, he denied Appellant's request for relief. Furthermore, the hearing judge determined, as a matter of fact, that "[t]he evidence presented at the hearing showed that the searches for evidence related to this case, dating back to 2002, produced no results" and, therefore, "the evidence was either lost or destroyed prior to that time."
Without specifically discussing retroactive application of the State's duty to preserve scientific identification evidence, the hearing judge concluded that "there was no law which existed at the time of [Appellant's trial], or indeed until Md.Code Ann., Criminal Procedure Article § 8-201 was enacted in 2001, that required the State to preserve scientific identification evidence [following Appellant's conviction and sentencing.]" Reiterating that the requested evidence was not located by the State, following a series of searches dating back to 2002, the hearing judge concluded that the evidence was destroyed prior to the time the unsuccessful searches began. Ultimately, the hearing judge determined that "[a]s no legal duty existed for the State to preserve the [scientific identification] evidence until 2001, any destruction that occurred prior to that time would not *942 have been in violation of a known legal duty[.]" Thus, the judge declined to grant Appellant's request for relief under § 8-201(j).
The hearing judge also declined to grant Appellant's Motion for a New Trial, reasoning that Appellant had not established, pursuant to § 8-201(c), that his "conviction was based on unreliable scientific identification evidence and a substantial possibility exists that [he] would not have been convicted without the evidence." Although Appellant compared the circumstances of this case to those in Arrington v. State, 411 Md. 524, 983 A.2d 1071 (2009), a case in which we reversed a circuit court judge's denial of a motion for a new trial, the hearing judge concluded that the instant case is distinguishable from Arrington in several material respects. First and foremost, the hearing judge noted that in Arrington the scientific identification evidence still existed and could be tested. Arrington, 411 Md. at 534, 983 A.2d at 1076. In contrast, the hearing judge concluded that "no scientific identification evidence exists [in this case] that may be tested in accordance with the standard methods used today." Moreover, the judge determined that "at the time of the trial, the testing that was done was reliable under the standard methods used at that time." The hearing judge also asserted that the serological evidence presented at Appellant's trial actually favored Appellant. Furthermore, according to the hearing judge, the serological evidence comprised only a small part of the rebuttal portion of the State's closing argument, as the State relied mostly on identification evidence and other circumstantial evidence to prove its case. Lastly, the hearing judge determined that "there is no indication in this case that the jury relied heavily on the serological evidence presented in making [its] decision."

DISCUSSION
In Gregg v. State, 409 Md. 698, 976 A.2d 999 (2009), we provided a comprehensive overview of the history of Md.Code (2001, 2008 Repl.Vol.), § 8-201 of the Criminal Procedure Article. We noted in Arey I, 400 Md. at 507, 929 A.2d at 510, that "the purpose underlying the statute ... is to provide a means for incarcerated persons to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[.]" Furthermore, in Thompson v. State, 395 Md. 240, 252, 909 A.2d 1035, 1043 (2006) [hereinafter Thompson I ], we concluded that the General Assembly expressed a concern with actual innocence in its adoption of the statute, as the legislative intent "was to provide a mechanism for exoneration of the actually innocent."
Md.Code (2001, 2008 Repl.Vol.), § 8-201(b) of the Criminal Procedure Article provides:
Notwithstanding any other law governing postconviction relief, a person who is convicted of a violation of § 2-201, § 2-204, § 2-207, or §§ 3-303 through 3-306 of the Criminal Law Article may file a petition:
(1) for DNA testing of scientific identification evidence that the State possesses as provided in subsection (j) of this section and that is related to the judgment of conviction; or
(2) for a search by a law enforcement agency of a law enforcement data base or log for the purpose of identifying the source of physical evidence used for DNA testing.
Pursuant to the language in the statute, this Court has determined that if the State has performed a reasonable search and has demonstrated sufficiently a prima facie case, either directly or circumstantially, that the requested scientific identification evidence no longer exists, the State will *943 have satisfied its burden of persuasion. See Horton v. State, 412 Md. 1, 7, 985 A.2d 540, 543-44 (2009); Arey I, 400 Md. at 505, 929 A.2d at 508.

A. Reasonable Searches
As we stated in Blake v. State, 418 Md. 445, 460, 15 A.3d 787, 796 (2011) [hereinafter Blake II ], "[t]he `clearly erroneous' standard of review is applicable to the Circuit Court's finding that [a] search... was `a reasonable search under § 8-201 of Maryland's Criminal Procedure Article.'" In construing this standard, we have maintained that we "must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." Ryan v. Thurston, 276 Md. 390, 392, 347 A.2d 834, 835-36 (1975) (citations omitted). Thus, "[i]f there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." Solomon v. Solomon, 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004) (quotation and citation omitted).
Blake I, 395 Md. at 216, 909 A.2d at 1022, involved the denial of a petition for DNA testing of scientific identification evidence that the State had used at Blake's trial for first degree rape and first degree sexual offense in 1982. Blake filed the petition for DNA testing pursuant to § 8-201 of the Criminal Procedure Article. Blake I, 395 Md. at 217, 909 A.2d at 1022. The State filed a motion to dismiss the petition, followed by a supplemental motion to dismiss, claiming that the scientific identification evidence had been destroyed well before October 1, 2001, the effective date of the statute. Id. Included with the motions were two attachments. Id. One of the attachments was a letter from an Assistant State's Attorney to a lieutenant of the Baltimore City Police Department requesting that the officer conduct a search of the Evidence Control Room to determine whether there was any evidence related to Blake's case. Id. The second attachment was a memorandum written by a sergeant and addressed to a major in the Baltimore City Police Department, indicating that the Evidence Control Room had been searched and no evidence had been located. Id. The court then summarily dismissed Blake's petition without a hearing and without giving Blake an opportunity to respond to the State's motion. Id.
On review before this Court, Blake contended that the lower court improperly dismissed his petition because it lacked an adequate factual record from which to conclude that the State no longer possessed the requested scientific identification evidence. Id. We held that because the State was the custodian of the evidence and because information regarding the location and potential manner of destruction of the evidence would be within the exclusive knowledge of the State, it had the burden of establishing that the evidence no longer exists. Blake I, 395 Md. at 232, 909 A.2d at 1031. In evaluating whether the State had met its burden, we held that "[a]n unsworn memorandum, stating that the State merely requested the police to look in the evidence control unit, is insufficient to establish [that the evidence no longer exists.]" Blake I, 395 Md. at 227, 909 A.2d at 1028.
While discussing the history of § 8-201 and the purpose of the statute, we described in detail a report issued by the National Commission on the Future of DNA Evidence. See Blake I, 395 Md. at 220-22, 909 A.2d at 1024-25 (discussing Nat'l Inst. of Justice, Nat'l Comm'n on the Future of DNA Evidence, Postconviction DNA Testing: Recommendations for Handling Requests (Sept. 1999) [hereinafter NIJ Report], available at http://www. *944 ncjrs.org/pdffiles1/nij/177626.pdf). We noted in Blake I that the Commission "cautioned prosecutors against concluding too hastily that evidence sought by an inmate no longer exists." Blake I, 395 Md. at 221, 909 A.2d at 1024 (citing NIJ Report at 45). The NIJ Report suggests looking for evidence in places where it will most likely be found, and it provides a list of recommended locations. Blake I, 395 Md. at 221-22, 909 A.2d at 1024-25 (quoting NIJ Report at 46). In accordance with the NIJ Report's recommendation that the State conduct an "extensive search for the evidence," we held that the State's efforts in Blake I were insufficient. Blake I, 395 Md. at 232-33, 909 A.2d at 1031 (citing NIJ Report at 36). Therefore, we reversed the judgment of the lower court and remanded the case for further proceedings. Blake I, 395 Md. at 239, 909 A.2d at 1035.
In Blake II, 418 Md. at 448, 15 A.3d at 789, we addressed the sufficiency of subsequent efforts by the State to conduct a reasonable search following our remand to the Circuit Court. The Circuit Court concluded that after "four hearings, during which [the court] received testimony, documentary evidence, affidavits, and proffered information about the State's efforts to locate the evidence sought to be tested," the State had met its burden of establishing a prima facie case that the requested scientific identification evidence no longer exists. Blake II, 418 Md. at 450, 15 A.3d at 790. We applied the clearly erroneous standard of review, and we concluded, based on the extensive search conducted by the State and the evidence presented on remand, that the Circuit Court judge's denial of Blake's petition was not clearly erroneous. Blake II, 418 Md. at 462, 15 A.3d at 797.
In Arey I, we addressed, inter alia, the issue of whether a Circuit Court judge erred in concluding that scientific identification evidence related to Arey's 1974 conviction for first degree murder and use of a handgun in the commission of a crime of violence no longer existed. Arey I, 400 Md. at 494-95, 929 A.2d at 503. Arey filed a petition requesting DNA testing of blood evidence, pursuant to § 8-201 of the Criminal Procedure Article. Arey I, 400 Md. at 494, 929 A.2d at 503. The court scheduled a hearing for the matter, but asserted that "[s]hould the State produce prior to the hearing an affidavit from someone with firsthand knowledge stating that the State no longer has the evidence for which the [appellant] has requested the testing, there will be no need for the hearing and it will be cancelled." Arey I, 400 Md. at 499, 929 A.2d at 505-06. A Baltimore City Police Department sergeant, on behalf of the State, thereafter filed an affidavit stating that he was in charge of the Evidence Control Unit (ECU), that he performed a search for the requested evidence by searching the ECU database and forms kept on file, and that he was unable to locate the requested evidence. Arey I, 400 Md. at 499, 929 A.2d at 506. In light of this affidavit and the fact that Arey did not produce any evidence to contradict it, the judge denied the petition for DNA testing. Arey I, 400 Md. at 499-500, 929 A.2d at 506.
On review, we reaffirmed our holding in Blake I that the burden is on the State to establish a prima facie case that the requested scientific identification evidence no longer exists. Arey I, 400 Md. at 504-05, 929 A.2d at 509 (quoting Blake I, 395 Md. at 232, 909 A.2d at 1031). We maintained that the State will only have satisfied its burden of persuasion after performing a reasonable search and demonstrating a prima facie case that the requested evidence no longer exists. Arey I, 400 Md. at 505, 929 A.2d at 509. We determined that unless there is a written record that the requested evidence has been destroyed in *945 accordance with existing protocol, the State must check every location where the evidence could reasonably be located. Arey I, 400 Md. at 503-04, 929 A.2d at 508. Ultimately, we held that the State did not perform a reasonable search for scientific identification evidence related to Arey's case because it did not search every location where the evidence could reasonably have been located. Arey I, 400 Md. at 503, 929 A.2d at 508-09.
On remand following this Court's mandate in Arey I, the Circuit Court held four hearings, during which the State provided a logbook from the Baltimore City Police Department's crime laboratory that indicated evidence from Arey's case had been examined in 1973 by a person with the initials "R.S.D." Arey v. State, 422 Md. 328, 332-33, 29 A.3d 986, 988-89 (2011) [hereinafter Arey II ]. The court ordered the State to ascertain the identity of this person, and the State subsequently provided an affidavit from Robert S. Davis, the crime laboratory technician who testified at Arey's original trial. Arey II, 422 Md. at 333, 29 A.3d at 989. The affidavit asserted that Mr. Davis did not recall examining the relevant piece of evidence, nor did he know where it might currently be located. Id. Mr. Davis did aver, however, that he did not personally keep evidence that he tested; rather, he returned the evidence to the Evidence Control Unit after testing was completed. Id. Lastly, Mr. Davis maintained that the small amount of sample that was tested would usually be consumed in the test. Id. The Circuit Court dismissed Arey's petition two days later, concluding that the State had conducted a reasonable search for the evidence. Id.
On appeal before this Court, we decided to remand the case again to the Circuit Court, reasoning that, "[a]lthough we decline to hold that the hearing judge's ultimate conclusion was clearly erroneous, we do decide that, on the record before us, the ruling was premature." Arey II, 422 Md. at 335, 29 A.3d at 990. We determined that Arey should have been given "the opportunity to probe, challenge, or otherwise respond to the statements in [Mr. Davis's] affidavit," despite the State's contention that continued questioning would not reveal any additional information regarding the location of the evidence. Arey II, 422 Md. at 337, 29 A.3d at 991.
In Horton v. State, 412 Md. 1, 8, 985 A.2d 540, 544 (2009), we reviewed the denial of a petition for DNA testing following Horton's conviction in 1983 for first degree rape, assault with intent to maim, and burglary. As part of the investigation, a rape kit had been collected by hospital personnel, and police had obtained the hospital gown and clothing of the victim, as well as biological evidence from the victim's home. Horton, 412 Md. at 8-9, 985 A.2d at 544. Horton's petition requested production of "any physical evidence related to the victim." Horton, 412 Md. at 9, 985 A.2d at 545. The State responded to the petition with an affidavit from the hospital's medical director, stating that the hospital does not retain cytology slides for more than ten years and that the hospital was unable to locate any slides or genetic material from the victim. Horton, 412 Md. at 10, 985 A.2d at 545. Thereafter, the court ordered the hospital to designate a corporate representative to be deposed. Horton, 412 Md. at 11, 985 A.2d at 545. During the deposition, the hospital's attorney stated that because there was no record of the victim ever being treated at the hospital in 1982, there was no way of determining where any relevant biological evidence samples would be located. Horton, 412 Md. at 11, 985 A.2d at 546.
The State subsequently filed an additional response including affidavits from a former forensic scientist with the Forensic *946 Biology Unit of the Montgomery County Crime Laboratory and from a supply technician in the Central Property/Evidence Unit of the Montgomery County Police Department. Horton, 412 Md. at 12, 985 A.2d at 546. The affidavits outlined the unsuccessful searches for the requested evidence. Id. The former forensic scientist indicated that in a notice she recovered, evidence related to Horton's case had been approved for destruction in 1986. Id. The supply technician claimed that he discovered a form entitled "Receipt for Property"; the form indicated that the case was closed, but it did not indicate that the evidence had been destroyed. Horton, 412 Md. at 12-13, 985 A.2d at 546-47. The State's response also included an assertion that "it was the practice at the time ... to authorize destruction of evidence [maintained by the Central Property Unit] in a non-capital case once the direct appeal process in a case was concluded." Horton, 412 Md. at 12-13, 985 A.2d at 546. A representative from the State claimed that he had searched unsuccessfully for evidence from Horton's case in the file at the State's Attorney's Office and the file at the Montgomery County Circuit Court. Horton, 412 Md. at 13, 985 A.2d at 547. The Circuit Court file contained letters from the Clerk of the court, dated in 1984, indicating that "the physical evidence introduced at Horton's trial was available for release and, if the evidence was not picked up, it would be disposed of `in such a manner as may be appropriate.'" Id.
The State requested that Horton's petition be dismissed. Id. Horton opposed dismissal, claiming that the search of the hospital had not been exhaustive, as the microbiology department had not been searched. Id. In addition, Horton asserted that the hospital had not granted his request for an interview with someone in the microbiology department and the State had not disclosed the victim's social security number to assist the hospital in conducting a more extensive search for the victim's medical records. Horton, 412 Md. at 13-14, 985 A.2d at 547. In denying Horton's petition, the hearing judge concluded that, based on the evidence presented by the State, "there is no reasonable basis to believe that any further investigation is going to lead to discovery of any evidence that could be subjected to any test for DNA." Horton, 412 Md. at 14, 985 A.2d at 548.
On review, we held that, although the search performed by the State came very close to complying with the standard set out in Blake I and Arey I, the court should not have dismissed the petition, "particularly in light of the narrowly tailored additional areas in which Horton wished to continue the search[.]" Horton, 412 Md. at 15, 985 A.2d at 548. We held that the burden of persuasion was on the State, and it had failed to establish, prima facially, that the evidence had actually been destroyed. Horton, 412 Md. at 16, 985 A.2d at 549. Moreover, we held that the hospital had not performed an exhaustive search of all of the places where the evidence might reasonably be located. Horton, 412 Md. at 16-17, 985 A.2d at 549. Therefore, we reversed the judgment of the Circuit Court and remanded the case for further proceedings. Horton, 412 Md. at 18, 985 A.2d at 550.

B. The Search in the Instant Case
Appellant urges this Court to hold that the Circuit Court erred in finding that the search conducted by the State was reasonable. Relying on our decisions in Blake I, Arey I, and Horton, Appellant maintains that "the State, and law enforcement agencies, continually shirked their duty to provide evidence retention policies despite this well settled obligation and an initial court order requiring each party to `identify any and all policies relating to the retention and destruction of such materials *947 which have been in place from January 1, 1989 until the present time[.]'" Appellant asserts that "without the requisite production of these retention policies, the search cannot be considered reasonable." Appellant claims that the only evidence retention policies provided at the evidentiary hearing by Roberta Mandelson, Director of Laboratory Services for Peninsula Regional Medical Center, were adopted in December 1996 and September 2007. Furthermore, Ms. Mandelson admitted that she "had no knowledge of any procedures or policies that predated 1996." With regard to testimony at the evidentiary hearing given by Lieutenant Wilson and Corporal Donahoe of the Wicomico County Sheriff's Office, Appellant notes that Lieutenant Wilson's knowledge of the evidence retention policies only goes back to October 2007 and Corporal Donahoe's knowledge of the retention policies only goes back to August 2008. In addition, although older versions of evidence retention policies are retained by the Administrative Captain, according to Appellant, those policies were not produced at or before the hearing. Thus, Appellant asserts that the State did not meet its burden and the case must be remanded for further proceedings because "[t]he hospital failed to produce any policy predating 1996, and [the] Sheriff's [O]ffice not only failed to produce the present written policy, but candidly admitted that it retained written versions of the [prior] policies it refused to disclose."
In contrast to Appellant's claims, the State maintains that the search performed was reasonable based on the "voluminous evidence presented regarding the non-existence of the evidencethe affidavits, the hearing testimony, [and] the hand-searches of any place the evidence could conceivably be." The State claims that "[w]hile it is undeniably true that the Sheriff's Department did not provide [the evidence retention] procedures, it is equally clear that no matter what the procedures were, they would not indicate that the evidence was anywhere except in the possession of the Sheriff's Department." Moreover, the State highlights the fact that "the evidence storage facilities of the Sheriff's Department were hand-searched in 2002 and 2009 in a fruitless attempt at locating Washington's slides." Thus, according to the State, the exhaustive search of the Sheriff's Office and the failure to locate any evidence there relating to Appellant's case provide strong support for the conclusion that the evidence no longer exists. The State interprets Blake II as holding that not every location listed in the NIJ Report must be searched. The State claims that, pursuant to this Court's holding in Blake II, it is logical to only search in places where the evidence might reasonably be expected to be found, and the State asserts that it has complied with this standard.
Based upon our case law construing § 8-201 of the Criminal Procedure Article, specifically the requirement that the State perform a reasonable search for the requested scientific identification evidence, we hold that the Circuit Court's conclusion that the search performed by the State in this case was reasonable was not clearly erroneous. We stress that the underlying purpose of § 8-201 is to locate and test evidence that might exonerate defendants who have been allegedly wrongfully convicted. See Thompson I, 395 Md. at 252, 909 A.2d at 1042-43. This initiative underscores the need to perform an extensive search to determine whether evidence has actually been destroyed. The hearing judge had substantial evidence before him in this case to determine that the scientific identification evidence requested by Appellant no longer exists and that it was destroyed prior to the enactment date of the statute.
*948 As we stated in Blake I, the burden is on the State to establish, prima facially, that evidence requested pursuant to a petition for DNA testing no longer exists. Blake I, 395 Md. at 232, 909 A.2d at 1031. The search conducted by the State in this case involved an extensive search of all the places the scientific identification evidence from Appellant's case might reasonably be located, including the State's Attorney's Office, the Sheriff's Office, the Maryland State Police Crime Laboratory, the Circuit Court, and Peninsula Regional Medical Center. The State's search thus included almost every location suggested in the NIJ Report. See Blake II, 418 Md. at 448-49, 15 A.3d at 789-90 (quoting Blake I, 395 Md. at 221-22, 909 A.2d at 1024-25). Sampson Vincent personally conducted a search of each shelf and box in the State's Attorney's Office and was unable to find any evidence, evidence logs, or documentation related to Appellant's case. Lieutenant Wilson and Corporal Donahoe personally searched each shelf and box in the Sheriff's Office property and evidence room, including the areas behind the shelves where evidence is kept. Lieutenant Wilson also indicated in his letter filed with the court that the last documentation in the chain of evidence log regarding scientific identification evidence from Appellant's case shows that on June 12, 1991, Wendy Restein, a clerk of the Circuit Court, returned the evidence to Howard Perdue, the Property Custodian at the time. Ms. Restein's testimony at the evidentiary hearing was that the property log from Appellant's case similarly indicated that she released the evidence from Appellant's trial to Howard Perdue on June 12, 1991.
The State produced a memorandum from James J. Nealon, the current Property Custodian, that was written in 2002 and indicated that a search of the Maryland State Police Crime Laboratory and all of the evidence vaults in the Sheriff's Office did not produce any scientific identification evidence related to Appellant's case. The court also received a letter from Sergeant Bromwell that stated that a search of the files at the Maryland State Police Department did not result in locating any of the requested evidence. In addition, an affidavit from Teresa Long, Director of the Maryland State Police Forensic Sciences Division, asserted that she and her staff searched the current logbooks, the logbooks for the long-term storage facility, the files kept for cold case analysis, and the current inventory list. This extensive search did not produce any evidence related to Appellant's case.
The affidavit and testimony of Roberta Mandelson indicated that she personally performed a search of Peninsula Regional Medical Center by looking in the slide storage areas in the Cytology Department, in her office, and in the old section of the hospital. During that search, Ms. Mandelson was unable to locate any hematology and histology samples, underwear, vaginal swabs, or laboratory slides related to Appellant's case. Ms. Mandelson asserted that the hospital's policy regarding retention of cytology slides is to keep the slides for ten years; after that period of time, the slides are microwaved and removed by an outside company that comes to the hospital twice per year. Because the victim in this case was examined in 1989, it was not clearly erroneous for the hearing judge to conclude that the hospital no longer has the slides related to Appellant's case.
We conclude that the facts of this case are analogous to the facts in Blake II. After we remanded the case to the Circuit Court in Blake I, the court held hearings during which it received testimony, documentary evidence, affidavits, and proffered information about the State's extensive efforts to locate the requested evidence. Blake II, 418 Md. at 450, 15 A.3d at 790. *949 We held in Blake II that, based on the record, "it [was] unreasonable to conclude that the evidence at issue ended up anywhere other than in the Evidence Control Unit [of the Police Department]." Blake II, 418 Md. at 461-62, 15 A.3d at 797. By conducting a reasonable search of the Evidence Control Unit, in addition to other law enforcement agencies, we held that the Circuit Court was not clearly erroneous in concluding that a reasonable search had been conducted by the State. Id. Similar to the circumstances in Blake II, the hearing judge in this case had substantial evidence before him to determine that the State conducted a reasonable search and satisfied its burden of persuasion that the evidence no longer exists. The judge was not clearly erroneous in concluding that the State searched for the scientific identification evidence from Appellant's case in every place where the evidence might reasonably be located and that the evidence was not present in any of those locations.
With regard to Appellant's contention that the State is required to produce the protocols from the Sheriff's Office, we agree with the State's assertion that even if the protocols from the time of Appellant's conviction to the time he filed his Petition for DNA Testing were produced, they would only indicate that the requested scientific identification evidence was in the possession of the Sheriff's Office. In light of the evidence presented by the State detailing the extensive search of the Sheriff's Office that was conducted in connection with these post-trial matters, it was not clearly erroneous for the hearing judge to determine that the requested scientific identification evidence no longer exists, within the possession of the Sheriff's Office or any other law enforcement agency.

C. Prospective Application of Duty to Preserve Evidence
Md.Code (2001, 2008 Repl.Vol.), § 8-201(j) of the Criminal Procedure Article provides, in relevant part:
(1) The State shall preserve scientific identification evidence that:
(i) the State has reason to know contains DNA material; and
(ii) is secured in connection with an offense described in subsection (b) of this section.
(2) The State shall preserve scientific identification evidence described in paragraph (1) of this subsection for the time of the sentence, including any consecutive sentence imposed in connection with the offense.[[9]]
(3) (i) If the State is unable to produce scientific identification evidence described in paragraph (1) of this subsection, the court shall hold a hearing to determine whether the failure to produce evidence was the result of intentional and willful destruction.
(ii) If the court determines at a hearing under subparagraph (i) of this paragraph that the failure to produce evidence was the result of intentional and willful destruction, the court shall:
(1) order a postconviction hearing to be conducted in accordance with subparagraph (iii) of this paragraph; and
(2) at the postconviction hearing infer that the results of the postconviction *950 DNA testing would have been favorable to the petitioner.
The statute is silent regarding whether the State's obligation to preserve scientific identification evidence is to be applied prospectively, meaning after the effective date of the statute, or retrospectively, meaning before the date of the statute's enactment. In the absence of a clear indication from the plain language of the statute, we look to the legislative history to determine the intent of the General Assembly. See Blake I, 395 Md. at 224, 909 A.2d at 1026. In reviewing the legislative history of § 8-201(j), specifically the State's duty to preserve scientific identification evidence, it is clear that the legislature intended for this duty to be applied prospectively.[10] Thus, we shall give effect to the legislature's intent, and we shall hold that the State's duty to preserve scientific identification evidence became effective on October 1, 2001, the date on which the statute was enacted. If the requested scientific identification evidence was lost or destroyed prior to October 1, 2001, subsection (j) does not apply and the petitioner is not entitled to any relief under that portion of the statute. If the requested scientific identification evidence was destroyed on or after October 1, 2001, the court must hold a hearing to determine whether such destruction was intentional and willful, and it must provide relief to the petitioner under subsection (j) in accordance with its conclusions. Because the hearing judge's determination that the scientific identification evidence in this case was lost or destroyed prior to the effective date of the statute was not clearly erroneous, the State had no statutory duty to preserve the scientific identification evidence and Appellant is not entitled to any relief under subsection (j).
When a statutory provision is ambiguous or otherwise unclear, we look to the rules of statutory construction for guidance. In Blake I, 395 Md. at 224, 909 A.2d at 1026, we discussed several well-settled principles of statutory construction:
The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. See Oakland v. Mountain Lake, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006). In ascertaining legislative intent, we first examine the plain language of the statute, and if the plain language of the statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written. See Mackey v. Compass, 391 Md. 117, 141, 892 A.2d 479, 493 (2006). If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. See Comptroller v. Phillips, 384 Md. 583, 591, 865 A.2d 590, 594 (2005). We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. Deville v. State, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. Gwin v. MVA, 385 Md. 440, 462, 869 A.2d 822, 835 (2005). We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory. Moore v. State, 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005).
The ultimate purpose of these principles of statutory construction is to ascertain the actual intention of the legislature and to *951 give effect to that intention. Mason v. State, 309 Md. 215, 219, 522 A.2d 1344, 1345 (1987).
This Court has held that "[a] retroactive statute is one which purports to determine the legal significance of acts or events that have occurred prior to the statute's effective date." Comm'n on Human Relations v. Amecom Div. of Litton Sys., Inc., 278 Md. 120, 123, 360 A.2d 1, 3 (1976). With regard to retrospective application of statutory provisions, in Gregg v. State, 409 Md. 698, 714, 976 A.2d 999, 1008 (2009) (citation omitted), we held that "[s]tatutes are presumed to operate prospectively; consequently, absent manifest legislative intent to the contrary, statutes may not be given retrospective or retroactive application." See also Rawlings v. Rawlings, 362 Md. 535, 555, 766 A.2d 98, 109 (2001); Langston v. Riffe, 359 Md. 396, 406, 754 A.2d 389, 394 (2000) (maintaining that "[i]n the absence of clear legislative intent to the contrary, a statute is not given retrospective effect" (quotation omitted)). This Court has utilized a two-part analysis when determining whether a statute may be given retroactive effect: "First, we must determine whether the Legislature intended the statute to have the kind of retroactive effect that is asserted.... If we conclude that the Legislature did intend for the statute to have retroactive effect, we must then examine whether such effect would contravene some Constitutional right or prohibition." Allstate Ins. Co. v. Kim, 376 Md. 276, 289-90, 829 A.2d 611, 618-19 (2003).
Appellant argued before the hearing judge that "when [the evidence] was destroyed is immaterial. The statute does not say, destroyed prior to 2001.... It says willfully and intentionally destroyed [with] no limitation as to when." Appellant argues before this Court that "[t]he statute has no requirement as to when the destruction occurred, nor that it be in bad faith or in violation of the statute; therefore, none of these showings are prerequisites to relief." Relying on the plain language of the statute, Appellant asserts that "if the General Assembly had intended § 8-201(j)(3) to pertain solely to destruction which occurred after 2001, it could have said so." Appellant argues that the statute should be applied retroactively. Accordingly, Appellant suggests that this Court should determine that the scientific identification evidence from Appellant's case was intentionally and willfully destroyed, because the only evidence retention and destruction policies produced by the State at the evidentiary hearing indicate that the practice of the Sheriff's Office is to retain evidence unless the State's Attorney approves destruction.
The State contends that because "prior to 2001 there was no law whatsoever regarding the retention of DNA evidence following a trial," it would be nonsensical for this Court to hold that evidence destroyed prior to the enactment of the statute triggers an evidentiary sanction against the State. Referring to the underlying purpose of the statute to exonerate those who are actually innocent, the State claims, "To interpret the statute as imposing a sanction to ensure compliance with the evidentiary preservation component of the law is rational; to interpret the statute as imposing a sanction to punish behavior which was perfectly lawful at the time is irrational." Arguing for a prospective application of the statute, the State maintains that the provisions of § 8-201(j)(3) do not apply to the circumstances of this case because prior to 2001, there was no statute and no common law duty to preserve evidence. Thus, according to the State and in contrast to Appellant's claims, the informal practices established by the Sheriff's Office "did not give rise to a `legal duty' to preserve evidence, and ... certainly did not give rise to the legal duty contemplated *952 in the 2008 amendment to the DNA Postconviction Act."
Because the plain language of § 8-201(j), as codified, is silent with regard to retroactive or prospective application of the State's duty to preserve scientific identification evidence, we look to legislative history to determine legislative intent. Examination of the legislative history of § 8-201 reveals that the General Assembly intended for the duty of preservation to operate prospectively. Specifically, Section 2 of Chapter 418 of the Maryland Laws of 2001 states: "The provisions of this Act providing for the retention and disposition of scientific identification evidence shall apply to any scientific identification evidence in the possession of the State on or after the effective date of this Act, regardless of whether the person was convicted before or on or after the effective date of this Act." 2001 Md. Laws, ch. 418, sec. 2 (emphasis added). Thus, pursuant to the legislative intent, subsection (j), and any relief offered therein, does not apply to evidence that was lost or destroyed before the effective date of the statute on October 1, 2001.[11] The hearing judge's determination that the scientific identification evidence in this case was lost or destroyed prior to the effective date of the statute was not clearly erroneous. Accordingly, Appellant is not entitled to any relief under § 8-201(j).

D. Motion for a New Trial
Md.Code (2001, 2008 Repl.Vol.), § 8-201(c) of the Criminal Procedure Article provides: "A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence." In Arrington v. State, we held that "[t]he question [of] whether to grant a new trial is within the discretion of the trial court. Ordinarily a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion." Arrington, 411 Md. 524, 551, 983 A.2d 1071, 1087 (2009) (quoting Cooley v. State, 385 Md. 165, 175, 867 A.2d 1065, 1071 (2005)). Generally, we will not disturb a circuit court's discretion in denying a motion for a new trial. Tierco Md., Inc. v. Williams, 381 Md. 378, 413, 849 A.2d 504, 525 (2004) (quoting Buck v. Cam's Broadloom Rugs, Inc., 328 Md. 51, 57, 612 A.2d 1294, 1297 (1992)). We have held that "[t]he abuse of discretion standard requires a trial judge to use his or her discretion soundly" and that discretion is abused when the judge exercises it "in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law." Campbell v. State, 373 Md. 637, 665-66, 821 A.2d 1, 18 (2003) (citing Ricks v. State, 312 Md. 11, 31, 537 A.2d 612, 622 (1988)). A trial judge's discretion to grant or deny a motion for a new trial "is not fixed and immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which *953 the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice." Merritt v. State, 367 Md. 17, 30, 785 A.2d 756, 764 (2001) (quoting Buck, 328 Md. at 58-59, 612 A.2d at 1298). Notably, "[a] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling." Gray v. State, 388 Md. 366, 383, 879 A.2d 1064, 1073 (2005) (quoting Dehn v. Edgecombe, 384 Md. 606, 628, 865 A.2d 603, 616 (2005)).
In Arrington, following his conviction in 1995 for second degree murder, Arrington filed a Motion for a New Trial. Arrington, 411 Md. at 527, 983 A.2d at 1072-73. At trial, the State in its opening statement expressed to the jury that someone from the crime laboratory "will testify and tell you that th[e] blood on the defendant's clothing is the same blood type as the blood that was the victim's blood." Arrington, 411 Md. at 555, 983 A.2d at 1089. The State called a forensic scientist who testified that he examined several blood stains from Arrington's pants that were "`consistent with the blood type of the victim in this particular case, or any other individual with the same blood type' because the blood sample contained the enzyme `PGM 1.'" Arrington, 411 Md. at 529, 983 A.2d at 1073. Various eyewitnesses also identified Arrington as the person who stabbed the victim. Id. During its deliberations, the jury sent a note to the trial judge inquiring about a notation on the blood analysis report. Arrington, 411 Md. at 529, 983 A.2d at 1074. The note included the following language: "The jury has a question regarding the penciled 59 percent next to stain no. 1 on the waste band of the defendant's sweat pants.... Does 59 percent of the population have matching PGM 1?" Id.
After his conviction and sentence, Arrington filed in the Circuit Court a Motion to Preserve Forensic Evidence and to Conduct DNA Analysis pursuant to § 8-201 of the Criminal Procedure Article. Arrington, 411 Md. at 533, 983 A.2d at 1076. The results of the DNA test "conclusively proved that the blood found on Arrington's seized clothing was not the victim's." Arrington, 411 Md. at 534, 983 A.2d at 1076. Arrington then filed a Motion for a New Trial and argued in support that the bloodstain evidence misled the jury into believing that scientific evidence proved his guilt. Id. Arrington claimed that the jury relied on this evidence based on the fact that it was highlighted in the State's opening statement and the jury asked a question regarding the blood analysis report during its deliberations. Arrington, 411 Md. at 534-35, 983 A.2d at 1076-77. The hearing judge denied Arrington's Motion for a New Trial, and Arrington noted an appeal to this Court. Arrington, 411 Md. at 536, 983 A.2d at 1077.
Before this Court, both Arrington and the State agreed that the appropriate standard for evaluating a motion for a new trial under § 8-201(c) was "whether a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial." Arrington, 411 Md. at 552, 983 A.2d at 1087. We held that the hearing judge's denial of Arrington's Motion constituted an abuse of discretion. Arrington, 411 Md. at 555-56, 983 A.2d at 1089. The State's opening statement and the jury note referencing the blood analysis report led us to conclude that the scientific identification evidence played an important role in the jury's deliberations. Arrington, 411 Md. at 555, 983 A.2d at 1089. Thus, we determined that "[t]he jury's focus on [the scientific identification] evidence, and the flat contradiction of the State's serology evidence shown by the *954 DNA evidence, persuade us that there is a `substantial possibility' that Arrington would not have been convicted if the DNA evidence had been introduced at trial." Id.
Thompson v. State, 411 Md. 664, 667, 985 A.2d 32, 34 (2009) [hereinafter Thompson II] involved a victim who had been stabbed, strangled, and sexually assaulted. The day after the victim's body was found, Thompson brought a knife to police that he claimed he had found near the victim's home; he also turned over a pair of bloodstained cut-off jeans he claimed he had been wearing when he located the knife. Id. Thompson testified at the trial of his co-defendant, James Owens, claiming that, while Owens raped and murdered the victim, Thompson masturbated and ejaculated. Thompson II, 411 Md. at 669-70, 985 A.2d at 35. In a later trial against Thompson, based on the same incident, this statement was used against him. Id. In addition, the State presented corroborating evidence from a criminalist, who testified that the blood found on Thompson's pants was the same blood type as the victim and that one of the pubic hairs found on the victim's back matched a pubic hair sample taken from Thompson. Id. The criminalist also testified that a pubic hair found on the victim did not match the victim, Owens, or Thompson. Id. A pathologist who testified at trial regarding semen recovered from the victim's vagina "explained the sperm disintegration timeline, which inferentially placed the deposit near [the time of the victim's] death[.]" Id. The State in its closing argument claimed that the sperm taken from the victim during her autopsy was from the rapist and that the knife given by Thompson to the police was the murder weapon. Thompson II, 411 Md. at 670-71, 985 A.2d at 35-36. With regard to the bloodstain on Thompson's shorts, the State asserted, "That is the blood of [the victim]." Thompson II, 411 Md. at 671, 985 A.2d at 36. The jury convicted Thompson of rape, burglary, felony murder, and a weapons offense. Id.
Thompson filed a Motion for a New Trial, pursuant to Maryland Rule 4-331, claiming that subsequent DNA testing excluded him and Owens as depositors of the sperm on the cytology slide and that testing of the bloodstain on Thompson's pants showed that the blood did not come from the victim. Thompson II, 411 Md. at 672-73, 985 A.2d at 37. The hearing judge determined that, based on the DNA evidence, Thompson was not the actual rapist. Thompson II, 411 Md. at 673, 985 A.2d at 37. The hearing judge, however, used the standard provided in Md. Rule 4-331 in deciding to deny Thompson's Motion for a New Trial, concluding that "the DNA evidence [does not] exculpate[] him of the primary crime of which he was accused felony murder." Thompson II, 411 Md. at 674-75, 985 A.2d at 38.
On appeal to this Court, we remanded the case to the post-conviction court to apply the appropriate standard, explaining that the appropriate standard is the "substantial possibility" standard set forth in § 8-201(c). Thompson II, 411 Md. at 683-84, 985 A.2d at 43-44. We also provided the post-conviction court with instructions for how to evaluate the impact of the DNA evidence that was the subject of Thompson's Motion for a New Trial. Thompson II, 411 Md. at 684, 985 A.2d at 44. We directed the court on remand to consider the fact that the sperm found on the victim did not belong to Thompson or Owens and that the blood on Thompson's pants did not belong to the victim, as these pieces of evidence were inconsistent with the State's theory at trial. Thompson II, 411 Md. at 689-90, 985 A.2d at 47. Because the post-conviction court considered it important that a pubic hair found on the victim matched a pubic hair taken from Thompson, *955 we stressed that the court on remand should "weigh the reliability of hair comparison techniques as compared to DNA testing available now," in light of the other DNA testing results. Thompson II, 411 Md. at 690, 985 A.2d at 47. Lastly, we noted that while the scientific testing results were important, if Thompson's confession provided details about the crime and the crime scene that would be unknown to anyone other than a perpetrator or witness, the post-conviction court "should give appropriate weight to such evidence." Thompson II, 411 Md. at 694, 985 A.2d at 49-50.
In the present case, contending that the hearing judge erred in denying his Motion for a New Trial, Appellant claims that "the key focus in evaluating a Motion under § 8-201(c) must be the present reliability of the science used to secure the conviction, within the practical reality of how [a] modern jury would presently view the evidentiary mosaic." Appellant focuses on the serologist's analysis of the semen found on the victim's underwear, in conjunction with her conclusion that Appellant is a non-secretor; Appellant states that whereas the serological testing performed in 1990 could not establish definitively whether Appellant had contributed to the semen stain, "present technology would ... confirm, or dispel, whether [Appellant] contributed to this semen, and might even identify the true rapist." Appellant maintains that "the virtual certainty of present DNA technology ... makes the basic enzyme serology utilized in 1990 unreliable." Thus, according to Appellant, "[t]he qualitative differences between the evidence as presented to the jury in 1990, and how it would be presented to a jury today, render[] the evidence as used at trial unreliable." Appellant analogizes the facts of his case to those in Arrington and Thompson II, claiming:
"[T]he realities of juror perception," Thompson II, 411 Md. at 687, [985 A.2d at 45], would not presently tolerate the State's theory of the case in an instance where the rapist ejaculated; the only certain forensic knowledge is that another man's semen was found on the victim's underwear hours after the rape; and, at best, the State can only show that the accused is part of twenty percent of the population who cannot be excluded as the culprit.
The State disagrees with Appellant's contentions, which the State interprets in the following way: "[Appellant] claims, in essence, that any person ever convicted of rape in the State of Maryland is entitled to a new trial if there have been any improvements in forensic DNA analysis since the date of his conviction, even when there is no remaining evidence to be tested under the new technique." The State claims that, in accordance with the Frye-Reed standard, the definition of reliability is "that which is generally accepted within the applicable scientific field." According to the State, the serological testing and results presented by the State at Appellant's trial meet this standard, as similar evidence has frequently and consistently been used in courts throughout the country. The State emphasizes the fact that the evidence introduced at Appellant's trial was "not the result of flawed testing or since-discredited science." Rather, serological testing is as valid today as it was at the time of Appellant's trial. In contrast to Appellant's claims, the State notes that "[t]he fact that in 2011 a prosecutor may choose a different, more specific test does not retroactively render the serological testing of 1990 `unreliable.'"
We hold that the hearing judge in this case did not abuse his discretion in determining that Appellant failed to establish that the scientific identification evidence *956 presented by the State at trial was unreliable and that there was a substantial possibility that he would not have been convicted without the use of that evidence. The hearing judge did not act in an arbitrary and capricious manner in determining that the serological testing used at the time of Appellant's trial was not unreliable. We agree with the State's contention that the existence of a more reliable test today does not make an older test unreliable. The hearing judge also did not act beyond the letter or reason of the law in determining that there was no indication from the record at trial that the jury relied heavily on the scientific identification evidence in convicting Appellant.
Although Appellant argues that the facts of his case are analogous to those in Arrington and Thompson II, we disagree. Importantly, in both Arrington and Thompson II, scientific identification evidence was available for DNA testing following the defendants' convictions. The results of those DNA tests indicated that some portion of the State's theory at trial was flawed and misleading to the jury. Arrington, 411 Md. at 555, 983 A.2d at 1089; Thompson II, 411 Md. at 689-90, 985 A.2d at 49. Furthermore, in Arrington there was evidence that the jury relied upon the scientific identification evidence in its deliberations. Arrington, 411 Md. at 529, 983 A.2d at 1074. In contrast to these cases, as the hearing judge noted, there is no scientific identification evidence left from Appellant's case to subject to DNA testing, and there is no evidence that the serological testing performed or the testimony given by the serologist at trial were unreliable. There is also no indication from the record at trial that the jury relied upon the serological evidence, rather than the other circumstantial evidence presented by the State, including the victim's identification of Appellant as her attacker, to convict Appellant of first degree rape and related offenses. Therefore, we hold that the hearing judge did not abuse his discretion in denying Appellant's Motion for a New Trial.
JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY IS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY APPELLANT.
NOTES
[1] We note that Appellant is now known by the name of Michael D. Washington-Bey.
[2] The denial of Appellant's Petition for Writ of Actual Innocence is not on review before this Court, and therefore, we do not address it.
[3] Scientific identification evidence is defined in Md.Code (2001, 2008 Repl.Vol.), § 8-201(a)(5) of the Criminal Procedure Article as evidence that:

(i) is related to an investigation or prosecution that resulted in a judgment of conviction;
(ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and
(iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.
[4] Md.Code (2001, 2008 Repl.Vol.), § 8-201(j) of the Criminal Procedure Article requires that the State preserve scientific identification evidence for the length of the petitioner's sentence. Furthermore, § 8-201(j)(3) provides, in relevant part:

(ii) If the court determines at a hearing under subparagraph (i) of this paragraph that the failure [by the State] to produce evidence was the result of intentional and willful destruction, the court shall:
(1) order a postconviction hearing to be conducted in accordance with subparagraph (iii) of this paragraph; and
(2) at the post conviction hearing infer that the results of the postconviction DNA testing would have been favorable to the petitioner.
[5] Md.Code (2001, 2008 Repl.Vol.), § 8-201(c) of the Criminal Procedure Article provides: "A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence."
[6] Ms. Coleman was taken to Peninsula General Hospital Medical Center (now Peninsula Regional Medical Center) for evaluation following the attack.
[7] Lieutenant Wilson's letter indicated that Mr. Perdue died on July 18, 2004.
[8] Corporal Donahoe also testified that if the investigating officer is no longer with the Sheriff's Office, the disposal form would go to that officer's supervisor to complete.
[9] This portion of the statute was amended in 2002. See 2002 Md. Laws, ch. 465. The original version of the statute provided that scientific identification evidence was to be retained for "a period of 3 years after the imposition of sentence" or "a period beyond 3 years that is required pursuant to an order issued within 3 years after the imposition of sentence by the Court of Appeals or Court of Special Appeals[.]" Md.Code (2001), § 8-201(i)(2) of the Criminal Procedure Article.
[10] We note that our holding with regard to prospective application of the State's duty to preserve scientific identification evidence, pursuant to § 8-201(j), has no bearing on our previous case law construing other provisions of the statute as having retroactive effect.
[11] In Blake II, 418 Md. at 450, 15 A.3d at 790, we expressed that "[i]n a Rules Order entered on September 10, 2009, this Court adopted Title 4, Chapter 700 of the Maryland Rules of Procedure, which took effect on October 1, 2009, and which `insofar as practicable, [is applicable] to all [petitions for DNA testing] then pending[.]'" Maryland Rule 4-710(a)(1)(A) provides that the court shall deny a petition for DNA testing if it finds that: "[T]he State has made an adequate search for scientific identification evidence that is related to the judgment of conviction, that no such evidence exists within its possession or within its ability to acquire from a third party on its own initiative or by court order, and that no such evidence that the State was required by law or applicable protocol to preserve was intentionally and willfully destroyed[.]" Insofar as this language may be ambiguous, that ambiguity is resolved in this opinion.